**In re CONDERE CORPORATION d/b/a Servis Fleet Tire Company, d/b/a Fidelity Tire Manufacturing Co.**

**Bankruptcy No. 9702549 WEE.**

United States Bankruptcy Court,
S.D. Mississippi,
Western Division.

Aug. 24, 1998.

burgh, PA, for United Steelworkers of America.

William J. Little, Jr., Jackson, MS, for Pensler Capital Corporation.

Dennis S. Kayes, Detroit, MI, for Titan International and Titan Tire of Natchez.

Shelia Sanders, Jackson, MS, for the Office of the United States Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE AMENDED MOTION FOR AN ORDER PURSUANT TO 11 U.S.C § 363 TO SELL ALL ASSETS OF THE DEBTOR

EDWARD ELLINGTON, Chief Judge.

This matter came before the Court on the *Amended Motion for an Order Pursuant to 11 U.S.C. § 363 to Sell All Assets of the Debtor* filed by Condere Corporation (the Debtor) and the objections thereto filed by the United Steelworkers of America, AFL—CIO—CLC, on behalf of itself and Local 303L (collectively, the Union), and Pensler Capital Corporation (Pensler), respectively.

At the conclusion of the trial,[1] the Court instructed the Debtor, the Union, and Pensler to submit proposed findings of fact and conclusions of law. After considering all testimony and evidence presented, the arguments of the parties, the pleadings on file, and the proposed findings of fact and conclusions of law, the Court finds that the motion should be granted subject to certain modifications and conditions.

### FINDINGS OF FACT

*History of the Debtor*

The Debtor manufactures tires at a plant in Natchez, Mississippi. This plant has been manufacturing tires under the name of several different tire companies since the 1960's. Most recently, the plant was owned by Armstrong Tire, and the plant primarily produced bias tires for cars which are the low margin portion of the tire market.[2] Charles

Craig M. Geno, Jackson, MS, for debtor.

Luke Dove, Jackson, MS, for Unsecured Creditors' Committee.

Richard M. Seltzer, New York City, David Jury, United Steelworkers of America, Pitts-

---

1. Evidentiary hearings were held on May 22ND, June 3RD, and June 17TH, 1998. Objections by parties other than Pensler and the Union were resolved before or during the trial.

2. This was the testimony of Charles Wright. Charles Wright, the current President and CEO

R. Byrnes, who has been employed at the Natchez plant since 1966, testified as to the history of the plant. He testified that the plant has had some profitable years, but that the plant has been unprofitable for many years. The plant became known as Condere Corporation when it was bought by an investor group, including various plant managers, in early 1987. Condere continued to make the same type of tires, and profitability and manufacturing operations continued to decline.

Since 1987, several tire companies have expressed interest in purchasing the Debtor. Over a several month period in 1990, Cooper Tire visited the plant on numerous occasions to discuss its possible purchase of the plant. In early 1995, the ownership of Condere discussed with Charles Wright the possibility of merging Denman Tire (Denman) with Condere. However, after examining the plant and the books and records of Condere over a 4 to 5 month period, Denman declined to merge or to purchase the assets of Condere due to the fact that Condere did not have a new collective bargaining agreement[3] with its union.

After Condere entered into a new collective bargaining agreement with the Union in 1996, Denman again showed interest in purchasing the assets of Condere, but a purchase did not come to fruition. In 1996, Galaxy Tire Company (Galaxy) became a shareholder of 21% of the stock of Condere. Up to and after the filing of the bankruptcy, Galaxy also considered buying the plant. Charles Byrnes also testified that a Swedish company, Trailerborg, expressed some interest in the plant and visited the plant in August of 1996, but Trailerborg did not make an offer to purchase Condere.

*The Chapter 11 Proceedings*

Condere filed a petition under Chapter 11 of the United States Bankruptcy Code[4] on May 13, 1997. On the following day, May 14, 1997, Titan Tire purchased 19% of the stock of Condere. Titan Tire is owned by Titan Investment Corporation. Maurice M. Taylor, Jr. (Taylor), is the CEO, President, and Chairman of the Board of the Debtor. Taylor is Chairman of the Board and CEO of Titan Tire (Titan). Taylor is also the President and CEO of Titan Tire's and Titan Investment Corp.'s parent, Titan International. Also on May 14, 1998, OTR Wheel, Inc. (OTR) purchased 34% of the Debtor's stock. 399 Venture Partners, Inc., f/k/a, Citicorp Venture Partners purchased 23% of the Debtor's stock. Taylor's brothers, Brent Taylor (until his death) and Fred Taylor, each were owners of a third of the stock of OTR and members of the Debtor's board. Thus, Titan Tire and OTR together own a majority of the stock of the Debtor.

Since September 1997, Russell Ash (Ash) has served as the General Manager and Plant Manager of the Debtor's plant. He is a consultant who was hired and who is paid by Titan International. Ash has been hired by Titan or Titan International in the past to manage and/or to turnaround Titan's plants. As General Manager and Plant Manager he reports to Taylor and Gary Carlson, the Vice President of Titan International.

A creditors' committee (the Committee) of nine creditors was appointed following the bankruptcy filing. The Committee consists of the following members:

| Creditor | Amt. of claim (in rounded $) |
| --- | --- |
| Sid Richardson Carbon Company | $ 1.25 million |
| Ennar–Bakrie Rubber, L.P. | $ 1.1 million |
| Monsanto Company | $ 836,000 |
| Alcan Rubber & Chemical, Inc. | $ 740,000 |
| Bayer Corporation | $ 657,000 |

of Denman Tire Corporation, which is owned by Pensler Capital Corporation, was manager of the plant for a period when it was owned by Armstrong.

**3.** The collective bargaining agreement was to expire in March of 1996.

**4.** Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

| | |
|---|---|
| Flexsys America L.P. | $ 541,000 |
| Alan L. Grant Rubber Division of Imperial Commodities Corp. | $ 530,000 |
| Riverside Central Services, Inc. | $ 36,000 |
| Roger Smith Heating & Cooling | $ 15,000 |

Luke Dove, of the law firm of Dove and Chill, was retained to represent the committee.

Debtor–in–Possession (DIP) financing is being provided by Fleet Capital Corporation. The DIP financing is guaranteed by letters of credit issued by Titan International for the benefit of Fleet. The Debtor has sought and obtained an extension of its DIP financing on two separate occasions In addition, the Debtor has obtained permission to use cash collateral on several occasions.

*Section 1113 Proceedings*

On the petition date, the Debtor shut down most of its production, and on June 27, 1997, the Debtor stopped all production and closed the plant. After negotiating in early June of 1997, with the Union over proposed changes in the collective bargaining agreement (CBA), the Debtor filed on June 10, 1997, its *Motion for Order Authorizing Debtor–in–Possession to Reject Collective Bargaining Agreement with Local Union No. 303L of the United Steelworkers of America Rubber Plastic Conference and to Implement Interim Modifications Under § 1113.* The United States District Court for the Southern District of Mississippi withdrew the reference as to that motion, and the Honorable E. Grady Jolly of the United States Court of Appeals for the Fifth Circuit, sitting by designation as a district court judge, heard the motion.

Hearings on the § 1113 motion were held in July and August of 1997. An agreement had been reached on most aspects of the CBA, and the Debtor and the Union ultimately stipulated that the District Court had authority to reject the CBA on specified conditions. Judge Jolly issued an order (the Rejection Order) on August 18, 1998, denying rejection of the CBA as to certain items and allowing rejection of other disputed items:

with the condition that (the Debtor) will implement its last best offer on these points—with respect to the reduction in the number of holidays, the change in the bereavement pay, the change in the Union business hours provision, and the changes in the overtime provisions. Furthermore, the debtor's motion to reject the contract will be granted with respect to wages, provided it implements its last best offer with respect to jobs classified as Grades 2A and 3A and implements the Union's last offer with respect to the inclusion of a new hire progression rate.

*Order,* pp. 3–4, August 18, 1997.

Judge Jolly went on to order that "(t)he parties will mutually agree on a document to be attached to this order reflecting the last best offers of the Union or the debtor, as the case may be, which complements the terms of this order." (*Order,* p. 4, August 18, 1997). However, it is this Court's understanding that no such document has been submitted to Judge Jolly and that the parties have more hearings scheduled before Judge Jolly on this matter.

Following the entry of the Rejection Order, over a period of time the Debtor called back employees and resumed production. Despite some differences with the Union about the interpretation of the Rejection Order, the Debtor has implemented its interpretation of what it believes Judge Jolly's order means.

*Current Productivity and Operations*

In the view of the Debtor, the elimination of incentive pay and other changes brought about by the Rejection Order, as well as the retraining of supervisors and bargaining unit employees when they returned to work, has resulted in greatly improved productivity, allowing the plant to now make new types of good quality, high margin tires. Furthermore, according to Ash, the employees are doing a "very good job." (Record at 87). The Committee is also pleased with the level of productivity achieved. The Debtor now makes 4,000–4,500 tires a day, as opposed to prior production of 400–500 tires a day, and portions of the plant are running seven days

a week. In Mr. Wright's opinion, the Debtor now has labor costs lower than any other unionized tire manufacturer in the country and is more productive than the Denman tire plant.

The Debtor is now selling 90–95% of its product to Titan, and is receiving cost plus 10% for its product. This arrangement should be profitable and produce a "fair return," in Mr. Ash's view, if production is greater than 3000 tires a day. Titan Tire also provides Condere with raw materials at prices "fairly close" to Titan's price, and generally accounts between Condere and Titan are done with journal entries, with net payments made every month or every few months.

At the 341 Meeting of Creditors, Taylor stated that the plant could be profitable if it had annual sales of $50 million. Taylor stated however that such a level of sales cannot be sustained without $20 million in capital improvements. Mr. Wright testified that the major determinants of profitability in the tire industry are productivity, the cost of raw materials, which should be fairly standard, labor costs, and sales price. Based on his knowledge of the Debtor and the evidence presented at the hearing, Wright testified that in his opinion the Debtor should now be generating $6–8 million in profits a year.

*The Debtor's Efforts To Sell the Company*

As stated previously, several companies, including Cooper Tire, Galaxy Tire, and Denman, have expressed some interest in purchasing the assets of the Debtor prior to the bankruptcy and post-petition, but none followed through with a definitive offer. However, prior to Titan buying a controlling interest in Condere, the Debtor's productivity had not yet increased, and profitability had not yet been achieved. Indeed, Taylor testified that Condere lost 17 million dollars in 1997.

The Committee pursued Galaxy, Pensler, and Carlisle as potential alternative buyers to Titan; however, the Committee was unable to obtain a firm offer to purchase the Debtor's assets from any of these companies. Luke Dove, counsel for the Committee, testified that "the Debtor and its representatives did nothing to locate any purchasers, other than Titan." (Record at 285–86). While it is true that the Debtor did not retain a consultant, broker, investment banker or an accountant to locate a buyer for the Debtor as the Objectors believe it should have, Taylor stated that it was his belief that taking such action would be an act of futility because everyone in the tire industry knew that the Debtor was in bankruptcy. Because there are a small number of manufacturers which also produce the specialized tires which the Debtor produces, the number of potential purchasers is limited.

In addition to the companies which had expressed interest in the Debtor post-petition, Taylor testified that he personally spoke with Galaxy and Carlisle about purchasing the Debtor, but no offer resulted from those talks. Mr. Taylor also testified that if another buyer would make an offer for the Debtor he would be "more than happy to walk away," but no company other than Titan has made an offer for the Debtor.

In October of 1996, Pensler had bought Denman Tire Co. As noted above, Denman had expressed interest in purchasing the Debtor pre-petition and immediately after the petition was filed (both before and after Pensler bought Denman). No final agreement was reached because the Debtor's performance deteriorated, no long-term union contract was in place, and the Debtor's then equity holders were demanding too high a share of equity in the proposed new company. Denman/Pensler conducted due diligence pre-petition. However, it was Mr. Wright's testimony that the pre-petition due diligence was no longer of any use because of changes in the business of the Debtor and the need for current information on the Debtor. Therefore, post-petition, Pensler expressed interest in visiting the plant and examining the Debtor's books and records. Pensler executed a confidentiality agreement in a form approved by the Court. Disputes between the Debtor, on one side, and the Committee and Pensler, on the other, over the information to be given to Pensler required repeated hearings before this Court. Mr. Dove, as attorney for the Committee, testified that obtaining information from the Debtor was "not an easy process" and "was

like pulling teeth to get the corporate representatives available and get the documents available for the due diligence inspections." (Record at 286). This Court remembers the disputes between the parties very well. Some of the disputes involved mis-communications between the Debtor and the Committee as to when due diligence inspections were to be held, and some disputes involved information which the Debtor claimed to be confidential, proprietary commercial information.[5]

*The Debtor's Efforts to Reorganize And Titan's Efforts to Purchase the Debtor*

On September 10, 1997, the Debtor filed its disclosure statement and plan of reorganization. In response to objections filed by the creditors, the Debtor filed its first amended disclosure statement and first amended plan of reorganization on December 12, 1997. Once again in response to objections, the Debtor filed a Second Amended Plan of Reorganization (the Plan) and Second Amended Disclosure Statement on February 17, 1998. (Exs. U–1, U–10). The Plan provided for payment of 80% of unsecured claims less than $5,000, and for other unsecured claims the lesser of 50% or a pro-rata share of $10 million, less amounts paid to the less than $5,000 claims, plus the proceeds from any litigation. While noting the existence of $5 million in directors and officers insurance in regard to potential causes of action against the Debtor's board of directors and equity holders, the Plan provided that the Debtor "retains these causes of action," but "does not believe they have any value and does not intend to pursue them." (Ex. U–10 at 38–39).

The Plan elicited many objections including those of the Committee and the Union. The Committee distributed a letter urging creditors to vote against the Plan. The Plan was rejected by all classes of unsecured creditors.

At the trial on the confirmation of the Plan, the Debtor withdrew the Plan and announced that it was filing a motion to auction the Debtor's assets. On April 3, 1998, the Debtor filed an *Amended Motion for Order to Authorize Auction of Substantially All Assets of the Debtor–In–Possession*[6] (auction motion).

The auction motion was scheduled for an evidentiary hearing on April 23, 1998. The auction motion stated that the "fair" way to sell the company was at an auction which was "advertised sufficiently to attract all interested buyers." (Ex. U–13 at 2). The auction motion garnered approximately seven objections, including the objections of the Committee and the Union.

Also set for trial on April 23, 1998, was the Committee's *Motion of the Unsecured Creditor's Committee to Approve Topping Fee.* The Committee was requesting the Court to approve a $400,000 topping fee for Pensler, which was based on a proposed term sheet submitted by Pensler to the Committee. Pensler's offer was subject to due diligence, because Pensler believed further information was necessary for a more definitive proposal.

The Committee's *Motion for Order Authorizing Appointment Pursuant to 11 U.S.C. § 1104(a) and Election Pursuant to 11 U.S.C. § 1104(b) of a Trustee* was also set for trial on April 23, 1998. The Committee had also filed motions to employ real estate and personal property appraisers, which were granted. These appraisals were prepared and were given by the Committee to Pensler. However, these appraisals were not introduced into evidence at the trial on the current motion before the Court.

Before the April 23rd trial on the Debtor's auction motion, and the Committee's topping fee and trustee motions, two meetings took place in which the final result was the Term

---

5. The Debtor appealed this Court's January 22, 1998, order directing it to disclose information which the Debtor claimed to be confidential, proprietary commercial information. United States District Court Judge Tom S. Lee issued a stay of this Court's order pending the Debtor's appeal. Judge Lee then issued an order upholding the Debtor's position (which was unopposed) that some of the information requested by the Committee was confidential information and that

this Court's order would be "modified so as to provide for a review of documents purported to contain confidential, proprietary, commercial information." *Order,* p. 4, June 15, 1998.

6. The Debtor filed its original *Motion for Order to Authorize Auction of Substantially All Assets of the Debtor–In–Possession* on March 18, 1998.

Sheet which is the subject of the instant motion before the Court. The first meeting took place in Cleveland, Ohio. This meeting involved the Committee and Taylor. During these negotiations, Taylor and Titan's counsel raised the possibility of converting the case to a Chapter 7, explaining that an advantage of Chapter 7, among other factors, was that Section 1113 was not applicable.

The Term Sheet was finalized on the morning of the April 23, 1998, trial. This meeting involved Taylor, Mr. Ash, Mr. Dove, Mr. Trulove (a co-chairman of the Committee from Sid Richardson Carbon Company), Mr. Craig Geno (counsel to the Debtor), Dennis Kayes (counsel to Titan), and Mr. William R. Leech (an attorney who represented some members of the Committee). At the meeting, Taylor stated that he was representing the buyer and the seller. Taylor testified that the fact that he was negotiating on behalf of the Purchaser and the Seller was not mysterious to any of the parties present. Taylor was authorized by the Debtor's Board to get the best price for Debtor. On behalf of Titan, Taylor stated that he was trying to buy the assets as cheaply as possible.

While the Committee agreed to the § 363 sales procedure contained in the Term Sheet, Mr. Dove did testify that "it was the preference of the Committee ... that we expressed that this matter be done by plan confirmation; because we felt, in the long run, that it would be quicker, more expeditious; and, in any event, we preferred a plan procedure. The Debtor had its own reasons for preferring this 363 sale motion, and we agreed to it." (Record at 305–06). But Mr. Dove also testified that:

> what we've referred to as "negotiations" was a long process; and it required considerable effort on behalf of the Committee and its professionals to get where we are today to get sufficient information to make the decision; and the (unsecured) creditors in this case are mainly credit people; and they're interested in a quick resolution of this and interested in getting their money, basically.

(Record at 306–7). Mr. Dove testified that Titan's initial offer to the unsecured creditors was "44 cents in cash and maybe 11 cents or 19 cents over a couple of years," (Record at 302), whereas the Committee's opening offer to Titan was, in simple terms, 75 cents on the dollar. So the Committee was satisfied with the final negotiated amount of 65 cents on the dollar.

Even though the Committee received no specific information during the negotiations from Taylor about Titan Tire of Natchez, the Committee believed "it had sufficient information to make a considered judgment and to execute the Term Sheet, which we did." (Record at 306). To no one's surprise, Taylor stated that the Purchaser was a mere shell, a holding company fully owned by Titan Investment Corporation, which is fully owned by Titan Tire, and that the seller and purchaser are thus affiliated companies.

The Debtor then filed its *Amended Motion for an Order Pursuant to 11 U.S.C. § 363 to Sell All Assets of the Debtor* (363 Motion) on April 27, 1998. Attached to the 363 Motion is a document styled *Term Sheet for Purchase of Assets of Condere Corporation by Titan Corp. of Mississippi* (Term Sheet). The 363 Motion seeks an order of this Court authorizing the Debtor to "sell all of its assets pursuant to the Term Sheet attached ..." to Titan Corporation of Mississippi (Purchaser). *Amended Motion,* p. 3, April 27, 1998. The Term Sheet is between the Debtor, Titan Tire Corporation, Titan International, and the Committee. It states that it is a "binding, enforceable contract."

The Term Sheet provides that the Debtor will sell all assets, including receivables, causes of action, and the assumption and assignment to the purchaser of all executory contracts and unexpired leases that the Purchaser elects to include. The assets would be sold in return for a purchase price which is described as the unliquidated sum of all secured debt, all allowed priority and administrative claims, and 65% of all allowed, unsecured, nonpriority claims, regardless of claims or liens against assets (including the ownership and related claims asserted by CIT Group/Equipment Financing, Inc.). Taylor estimates this price to be between $37–43 million.

The purchase price is to be paid in cash 11 days after an order is entered on the § 363 Motion, except that unsecured claims are estimated at $20 million and will be provided for by a letter of credit, with the Purchaser having a continuing obligation to make payments for administration and other claims that are allowed until the case is closed. While the Term Sheet provides that all payments and obligations of the Purchaser will be guaranteed in writing by Titan Corp. of Mississippi, this was a mistake. At the trial on the 363 Motion, Taylor stated that this should have been Titan International.

The Committee was satisfied that the ultimate proposal contained in the Term Sheet, "under the circumstances of this case ... was a fair proposal." Mr. Dove stated that one of the circumstances was that the Debtor "is controlled by Titan and Mr. Taylor; the Debtor's business is essentially changed; and the Debtor corporation really now is a—it's not even a subsidiary. I mean, it's just a division of Titan International, from the—from our standpoint...." (Record at 305, 312).

*The Business Justifications of the Debtor*

At the trial, the Debtor stated its business justifications for the 363 Motion. One reason was the Debtor's cash shortage. Mr. Ash projected that as of the date of his testimony, May 23, 1998, the Debtor had $1.6 million in remaining DIP financing, was utilizing $500,-000–$600,000 in such financing a week, or $2 million a month, and that the Debtor would be run out of money in two to four weeks and would have to lay off employees. In fact, the Debtor gave a notice of closing to employees with a date of July 28, 1998. But, it should be noted that the Debtor has given layoff notices in the past and not shut down. Mr. Wright testified that in his opinion, he believed that the Debtor should be profitable. He further stated that he did not understand how the Debtor could be losing money as it did in April 1998. However, on cross examination, he stated that he did not know if the Debtor had any extraordinary expenses or wage adjustments which were deducted in the month of April. Mr. Taylor testified that quarterly adjustments were made during the month of April for wages, for scrap, for expenses of the bankruptcy, and for engineering expenses.

Probably the most important business justification stated by the Debtor was the need to make capital expenditures so that the Debtor could continue to produce tires profitably. Taylor testified that the plant was closed post-petition in order to make repairs on the plant. In addition, the tires Condere was producing pre-petition could not generate a profit. So after repairing the plant, Titan sent new tire molds to the Debtor's plant instead of beginning to produce the same unprofitable tires. These molds would produce Titan speciality tires which could be sold to generate a profit for the Debtor. After the plant was repaired and the new molds installed, Taylor testified that Titan gave the Debtor a six or seven month lead inventory run to see if it was possible for the Debtor to increase production and productivity. Since the Debtor was able to increase production and productivity, Taylor stated that it is now time to bring in newer and better equipment, estimated at a cost of 20 million dollars, so that the Debtor itself can produce these speciality tires. Taylor stated that Titan is not willing to make a 20 million dollar capital infusion in the Debtor without the sale of the Debtor's assets to the Purchaser, and, without the capital infusion, the Debtor cannot produce a profitable tire.

Another business justification of the Debtor for the 363 Motion is that, as stated previously, the Debtor has been looked at by many different tire companies over the past ten or so years. However, no other tire company has made an offer to purchase the Debtor. Titan International, through the Purchaser, is the only company who has made an offer to purchase the Debtor's assets. Therefore, the Debtor must not pass on this sale especially since it is a sale that is satisfactory to its creditors.

### CONCLUSIONS OF LAW

#### I.

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C.

§ 157. This is a core proceeding as defined in 28 U.S.C. § 157(B)(2)(A), (N), and (O).

## II.

The two general issues before the Court are as follows: (1) Does Pensler have standing to object to the 363 Motion, and (2) May the Debtor sell all of its assets pursuant to § 363(b). The Court will address these issues in the order listed above.

### A. STANDING OF PENSLER

The Debtor alleges that on May 13, 1998, the date objections to the 363 Motion were due, Pensler was not a creditor of the Bankruptcy Estate, and therefore, Pensler was not a party-in-interest which had standing to object to the 363 Motion. Pensler filed a *Notice of Transfer of Claim Other Than for Security and Waiver of Notice* on May 21, 1998. In the notice, Pensler states that it purchased the claim of Fluid Power Systems, Inc. in the amount of $600.25. The Debtor argues that since Pensler's purchase of the claim of one of the Debtor's unsecured creditors was after the May 13, 1998, deadline, Pensler did not have standing to object on May 13, 1998. The Debtor alleges that on May 13, 1998, Pensler was simply a prospective purchaser.

■ The Court does agree with the Debtor that a prospective purchaser has no standing to object to a sale. *See In re NEPSCO, Inc.,* 36 B.R. 25 (Bankr.D.Me. 1983); *Davis v. Seidler (In re HST Gathering Co.),* 125 B.R. 466 (W.D.Tex.1991). However, due to the fact that Pensler had filed notice of its purchase of a claim prior to the trial on the 363 Motion, the Court will not strike Pensler's objection for lack of standing on the day Pensler filed its objection to the 363 Motion.

### B. SUFFICIENCY OF NOTICE

The sale of a debtor's assets outside the ordinary course of business is governed by

§ 363(b) of the Bankruptcy Code. Section 363(b)(1) provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

The Union and Pensler (collectively, the Objectors) allege that the Debtor's notice of its 363 Motion was insufficient. Section 363 states that the debtor [7] "after notice and a hearing" may sell property of the estate other than in the ordinary course of business. Section 102(1)(A) defines "after notice and a hearing" as "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances...."

■ Federal Rule of Bankruptcy Procedure [8] 6004 pertains to the use, sale, or lease of property of the estate. Rule 6004 states in pertinent part:

> **Rule 6004. Use, Sale, or Lease of Property.**
>
> **(a) Notice of Proposed Use, Sale, Or Lease Of Property.** Notice of a proposed use, sale, or lease of property ... not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k)....

Rule 2002 provides in pertinent part:

> **Rule 2002. Notices to Creditors, Equity Security Holders, United States, and United States Trustee.**
>
> **(a) Twenty-day Notices To Parties In Interest.**
>
> (T)he clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 20 days' notice by mail of:
>
> ....
>
> (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business ...
>
> ....
>
> **(c) Content Of Notice.**

---

**7.** Pursuant to § 1107(a), a debtor-in-possession in a Chapter 11 case has the rights, powers, and duties of a trustee. Hereinafter, the Court will use the term debtor instead of trustee.

**8.** Hereinafter all rules refer to the Federal Rules of Bankruptcy Procedure unless noted otherwise.

(1) Proposed Use, Sale, or Lease of Property. Subject to Rule 6004 the notice of a proposed use, sale, or lease of property required by subdivision (a)(2) of this rule shall include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections. The notice of a proposed use, sale, or lease of property, including real estate, is sufficient if it generally describes the property.

. . . .

### (i) Notices to Committees.

Copies of all notices required to be mailed pursuant to this rule shall be mailed to the committees . . . appointed under § 1102 of the Code. . . .

. . . .

### (k) Notices To United States Trustee.

(T)he Clerk, or some other person as the court may direct, shall transmit to the Untied States trustee notice of the matters described in subdivisions (a)(2). . . .

"In general, the notice of a proposed sale must include the time and place of a public sale or the terms and conditions of a private sale, and must also include the time fixed for filing objections. A notice is sufficient if it describes generally the property to be used, sold or leased." 3 L. King, *Collier on Bankruptcy* ¶ 363.02[1][a] at 363–11 to 12 (15th Ed. Revised 1998) (footnotes omitted).

■ In the case at bar, the Debtor's *Amended Notice* (Notice) has a copy of the 363 Motion attached to it and states the time fixed for filing objections. The Debtor's *Amended Certificate of Service* states that the Notice, including the 363 Motion, was mailed to all creditors and parties-in-interest. However, the Objectors allege that this Notice is not sufficient. The Objectors argue that because the 363 Motion does not specify the Debtor's business justification for the

sale and explain the relationship between the Debtor, Purchaser, and the Guarantor, the Notice was insufficient.

The court in *In re Naron & Wagner, Chartered*, 88 B.R. 85 (Bankr.D.Md.1988) listed four requirements which it believed, in the case before it,[9] that the notice of a § 363 motion should contain:

In order for notice to provide appropriate, and thus adequate, information in the instant situation, the notice should: 1) place all parties in interest on notice that Debtor is liquidating its business under Chapter 11; 2) disclose accurately the full terms of the sale, including the identity of the purchaser; 3) explain the effect of the sale as terminating Debtor's ability to continue in business, and 4) explain why the proposed price is reasonable and why the sale before confirmation is in the best interests of the estate.

*Naron & Wagner*, 88 B.R. at 89.

This Court will use these requirements as a guideline in the case at bar and examine them in light of what notice "is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). The Court finds that the Notice[10] satisfies the first requirement in that it adequately placed all creditors and parties-in-interest on notice that the Debtor was selling all of its assets and liquidating its business—the Term Sheet states that the Debtor and the Committee will file a joint plan of liquidation.

As to the second requirement, the Court finds that the Notice discloses the full terms of the sale and identifies the purchaser as "Titan Corp. of Mississippi, or its designee."[11] At the trial on the 363 Motion, Taylor testified that although the Term Sheet stated that the purchaser was to be Titan Corp. of Mississippi, the employees of

---

**9.** In *Naron & Wagner* the debtor was seeking court approval to sell by a private sale its wholly owned subsidiary to insiders of the subsidiary. In *Naron & Wagner* no objections were filed by any creditors, but the court reviewed "the adequacy of the notice to ensure that inadequate notice was not the cause of the failure of a party-in-interest to object." *Naron & Wagner*, 88 B.R. at 89.

**10.** As the 363 Motion was attached to the Notice and mailed to all of the creditors and parties-in-interest, the term "Notice" includes the actual page which is styled *Amended Notice* as well as the actual amended 363 Motion and the Term Sheet attached to the 363 Motion.

**11.** *Amended Motion for an Order Pursuant to 11 U.S.C. § 363 to Sell All Assets of the Debtor*, p. 1, April 27, 1998.

the plant and the mayor of Natchez preferred that the name of the new company include the name Natchez. Therefore, Taylor testified that the name of the purchaser would be changed to Titan Tire of Natchez which would be wholly owned by Titan Tire. In turn, Titan Tire is a wholly owned subsidiary of Titan International. The changing of part of the name of the Purchaser is not misleading. The Term Sheet stated that the Purchaser was "Titan Corp. of Mississippi, or its designee." Over the course of the year that the Debtor's case has been pending, the creditors and the parties-in-interest in this case have been made very aware of the name "Titan" as it relates to the manufacturing of tires. The fact that the name of the Purchaser is being changed to "Natchez" instead of "Mississippi" does not cause the Notice to be inadequate.

Taylor also stated that the Term Sheet contained a typographical error. He stated that the party guaranteeing the payments and obligations of the Purchaser should have been listed as Titan International and not Titan Corp. of Mississippi. While the Objectors make much of this typographical error, the Court finds that in the context of this case, the error was not fatal and did not mislead creditors or parties-in-interest.

While the Notice does not specifically "explain the effect of the sale as terminating Debtor's ability to continue in business," *Naron & Wagner*, 88 B.R. at 89, the Court does not find this to be an important requirement in determining the adequacy of the Notice. After reading the 363 Motion and the Term Sheet, the Court finds that the only reasonable conclusion one could draw is that once the Debtor sells all of its assets, it will not continue to manufacture tires.

With regard to the fourth requirement, the 363 Motion states that the Debtor's proposed plan was rejected by its creditors because the creditors believed that the equity in the Debtor was greater than the 10 million offered in the Debtor's plan. The 363 Motion further states that the agreement reached between the Debtor, the Purchaser, and the Committee would pay the allowed, unsecured non-priority claims 65% of their claim (estimated to be $20,000,000). Other than stating

that the Debtor and the Committee would file a joint disclosure statement and plan of liquidation, the 363 Motion does not state anything about the pre-confirmation sale being the best interest of the estate other than the statement that "(t)he Debtor believes that the sale as provided herein is in the best interest of the Estate and its creditors." *Amended Motion*, p. 3, April 27, 1998. While the Debtor could have expounded on the reasons it believed the sale was in the best interest of the Debtor and why it believed the price to be reasonable, the Court finds that this is not a fatal flaw. The Court believes that the fact that the Committee agreed to the dollar amount being offered to the unsecured creditors would be an indication to the creditors and parties-in-interest that the price being offered was reasonable. In the circumstances of this case and reading this Notice along with prior notices sent to all creditors and parties-in-interest, the Court finds that the Notice, while not the most informative notice that could have been sent to the creditors and parties-in-interest, is not so flawed as to have failed to provide adequate notice to the creditors and parties-in-interest. *See Naron & Wagner*, 88 B.R. at 89.

## C. SALE OF ALL OF THE DEBTOR'S ASSETS

As previously noted, the sale of a debtor's assets outside the ordinary course of business is governed by § 363(b) of the Bankruptcy Code. The question of whether a debtor can sell all of its assets prior to confirmation pursuant to § 363(b) then arises.

It is now generally accepted that section 363 allows such sales in chapter 11, provided, however, that the sale proponent demonstrates a good, sound business justification for conducting the sale prior to confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.

*Collier*, ¶ 363.02[4] at 363–19 to 20 (footnotes omitted). The United States Court of Ap-

peals for the Fifth Circuit initially addressed the issue of § 363 sales in *Pension Benefit Guar. Corp., Continental Airlines, Inc. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir.1983), *reh'g denied*, 705 F.2d 450 (5th Cir.1983). A good overview of *Braniff* is found in *In re San Jacinto Glass Industries, Inc.*, 93 B.R. 934 (Bankr.S.D.Tex.1988), In *San Jacinto Glass*, Judge Margaret A. Mahoney wrote:

> *Braniff* established a standard for reviewing a proposed Section 363 transaction for sale, or use or lease of the estate's property outside the ordinary course of business. The transaction in *Braniff* essentially involved a "swap" of travel benefits on the purchaser-airliner in exchange for Braniff's terminal leases and landing slots. Acceptance of the deal was conditioned on obtaining certain concessions by the creditors of Braniff. These included compromising or releasing claims against the airline, and automatically endorsing any plan of reorganization approved by a majority of the creditor's committee.

> The *Braniff* court found that the voting curtailment and the release of claims provisions went beyond the scope of § 363. The court stated that when a transaction attempts to specify the terms of a reorganization plan, the parties must go through the Chapter 11 requirements of disclosure (11 U.S.C. § 1125), voting (§ 1126), and best interest of creditor's test (§ 1129(b)(2)(B)). Application for authority to sell would not be appropriate for such a far-reaching proposal as was the "conditioned swap" of *Braniff*.

*San Jacinto Glass*, 93 B.R. at 943 (citation omitted).

The Fifth Circuit determined that the *Braniff* sale was a plan *sub rosa* because it dictated some of the terms of any future reorganization plan, restructured the rights of creditors, and required all parties to release all claims against the debtor, its officers, directors, and secured creditors. In contrast, the proposed sale in the instant case is a simple exchange of assets for cash. It is unlike the far reaching terms of the sale the Fifth Circuit objected to in *Braniff*. Although the Term Sheet calls for the full payment of all secured and priority claims and payment of 65% of all allowed unsecured claims, it does not dictate the allocation of the sale proceeds as the settlement in *Braniff* did. This settlement simply gives the Debtor money which will be paid to creditors according to the Code. The reference to payment of claims is made only to determine the sales price—the Term Sheet makes no attempt to dictate which claims have priority or which claims are allowed or disallowed. Nor does the Term Sheet restructure the rights of any creditors, require any creditors to cast votes for any plan, or dictate any terms of any plan as in *Braniff*. Unlike the "deal" in *Braniff*, the "deal" in the case at bar is not contingent upon concessions by the Debtor's creditors. Finally, although the Term Sheet contemplates the sale of potential claims against certain insiders of the Debtor, it does not require the waiver of any such claims by individual creditors. In short, the Debtor's proposed sale has none of the far-reaching effects of the *Braniff* transaction.

Several courts have upheld asset sales which did not "alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in (*Braniff*)." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1313 (5th Cir.1985); *In the Matter of Cajun Electric Power Cooperative, Inc.*, 119 F.3d 349 (5th Cir.1997). *See also In re Naron & Wagner, Chartered*, 88 B.R. 85 (Bankr.D.Md. 1988) (proposed sale was not a plan *sub rosa* because it sought only a liquidation of assets and did not restructure the rights of creditors.).

The Fifth Circuit revisited the issue of § 363(b) sales in *Institutional Creditors of Continental Air Lines v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223 (5th Cir.1986). In addressing the question of plans *sub rosa*, the Fifth Circuit held that:

> Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan. *See In re Allison*, 39 B.R. 300, 303 (Bankr.D.N.M.1984). At the

same time, we fully appreciate that post-petition, pre-confirmation transactions outside the ordinary course of business may be required and that each hearing on a § 363(b) transaction cannot become a mini-hearing on plan confirmation. Balancing these considerations, we hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan.

*Continental,* 780 F.2d at 1227–28. The objections filed by Pensler and the Union to the 363 Motion do not "specify exactly what protection is being denied" as required by *Continental.* In its objection (and in its proposed findings of fact and conclusions of law), the Union appears to be arguing that the protections it is being denied are notice, the lack of a disclosure statement, and voting on a plan. However, even assuming that the Objectors have specified what Chapter 11 protections they allege that they are being denied, the Court does not agree with their argument. As the Fifth Circuit stated in a recent opinion, "(t)he Committee ... listed various procedural protections afforded by Chapter 11, such as the right to a disclosure statement providing adequate information about any proposed plan. Missing from this recitation is any indication of how the Committee might lose these protections if the settlement is approved." *Official Committee of Unsecured Creditors v. Cajun Electric Power Cooperative (In re Cajun Electric Power Cooperative),* 119 F.3d 349, 354 n. 3) (5th Cir.1997). According to the Term Sheet, once the 363 Motion is approved, the Debtor will file a plan of liquidation and a disclosure statement.

In *Continental,* the Fifth Circuit expounded on its holding in *Braniff.* In *Continental,* the Fifth Circuit held that in order for the debtor "to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *Continental,* 780 F.2d at 1226 (citations omitted). The court went on to state that "(w)hether the proffered business justification is sufficient depends on the case." *Id.* The Fifth Circuit cited, with approval, the Second Circuit Court of Appeals case of *In re Lionel Corp.,* 722 F.2d 1063 (2nd Cir.1983) in which the Second Circuit enumerated the factors which a bankruptcy judge should consider when examining a § 363 sale. Adopting *Lionel,* the Fifth Circuit held that the bankruptcy judge:

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, ` the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Continental,* 780 F.2d at 1226, *quoting, Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2nd Cir.1983) (other citations omitted). The *Continental* case involved the use under § 363(b) of estate assets to lease new aircraft at a cost of seventy million dollars over a ten year period. *Continental,* 780 F.2d at 1225. The debtor's proffered business justification was that the new leases would allow the debtor to respond to an increase demand for its services, to exploit an existing commercial advantage by offering new routes, to take advantage of opportunities for more foreign routes, and to increase cash flow and profit. *Id.* at 1227. Based upon the facts of the case before it, the Fifth Circuit found that this

justification was sufficient to allow the continued lease negotiations.

In the case at bar, the Debtor has been a troubled company since the late 1970's. Indeed, the month prior to the filing of the petition, Taylor testified that the Debtor lost in excess of one million dollars. As stated previously, many different tire companies have expressed an interest in purchasing the Debtor, but up to this point in time, no one other than the Purchaser has "put an offer on the table." The parent of the Purchaser, Titan International, has been the only party who has been willing to expend a substantial amount of time, money, and manpower in an effort to make and to keep the Debtor a viable, going-concern.

Applying some of the *Lionel* factors to the case at bar, the 363 Motion was filed after the Debtor had been in its Chapter 11 proceeding for eleven months, and it has not been an easy eleven months. It has been eleven months of acrimony and negotiations between the Debtor and the Committee over every aspect of this case. The Debtor has not only filed a plan of reorganization and a disclosure statement, but it has also filed two amended plans and two amended disclosure statements in response to creditors' objections.[12] Due to the fact that the Debtor's second amended plan generated many objections and the Debtor was unable to get the plan confirmed, the Debtor withdrew the amended plan.

The Debtor then attempted to sell the assets of the estate through an auction, however, this motion was also rejected by the creditors. Given the contentious nature of this case, the Court does not believe that there is a good likelihood that the Debtor would be able to propose a plan of reorganization that would be confirmed in the near future.

Most significantly, the assets of the Debtor are declining in value. The manager of the plant, Mr. Ash, testified that the Debtor was rapidly exhausting the available funds it needed to operate and that the Debtor needed an infusion of capital in order to upgrade its technology and equipment in order to be competitive in the global economy. Mr. Ash further testified that if the Debtor ran out of money it would be forced to shut the plant down which would incur more costs to the Debtor in order to restart the manufacturing process.[13] Also, if the plant is shut down, then its value as a going concern would be greatly reduced.

Even though the Committee obtained appraisals of the assets, the appraisals were not introduced into evidence by any party. Therefore, the Court cannot compare the proceeds to be obtained from the disposition of the assets with the appraised value of the assets. However, the Court believes that the statement of Ash, the consultant who was hired to turn the plant around, that it was his opinion that the property is not worth what the Purchaser is paying for it to be a very realistic statement. After considering the *Lionel* factors, the Court believes that the Debtor has shown a sufficient business justification for the sale of the assets to the Purchaser.

The Objectors cite several cases to support their position that the 363 Motion should be denied. In *In the Matter of Embrace Systems, Corp.*, 178 B.R. 112 (Bankr.W.D.Mich. 1995), the court found that the debtor's proffered business justification was insufficient to warrant approval of a sale for several reasons. Unlike in the case at bar, the court found that the case had been pending for only four months when the motion was filed and that there was still time for the debtor to propose the same sale in a plan and a disclosure statement. The court also found that there was insufficient evidence to find that the assets were declining in value or that the sale was commercially reasonable. In addi-

**12.** The Debtor's *Second Amended Disclosure Statement* was approved by the Court on February 18, 1998. It, along with the Debtor's *Second Amended Plan*, was mailed to all creditors and parties-in-interest.

**13.** The Court does acknowledge that Mr. Charles Wright, President and CEO of Denman Tire

Company disputed Mr. Ash's and Mr. Byrne's statements as to the condition of the Debtor's equipment. However, Mr. Wright also stated that "it's hard to determine the condition of equipment when it's not running." (Record at 351)

tion, unlike in the case at bar, the purchaser was not able to prove to the court that it had the funds necessary to consummate the sale. The only similarity to the case at bar is that both sale motions contemplated the sale of substantially all of the assets of the estate.

Likewise, the case of *In re Crutcher Resources Corp.*, 72 B.R. 628 (Bankr. N.D.Tex.1987) can be distinguished from the case at bar. In analyzing the Fifth Circuit's holding in *Continental*, the court found:

> The (Fifth Circuit) recognized that fundamental reorganization "piecemeal" under § 363 made creditors' rights under the Code's protections meaningless. (*Continental*, 700 F.2d) at 1227. On the other hand, the Court stated that § 363(b) transactions postpetition and preconfirmation may be required by business considerations.

*Crutcher*, 72 B.R. at 631. However, the *Crutcher* court denied the debtor's motion in the case before it because it found the debtor failed to establish good business justifications for the sale. In *Crutcher* the motion to sell all of the assets of two subsidiaries of the debtor was filed within two months of the day the petition was filed. The court found that the reasons stated for the sales were not the business justifications of the debtor, but rather, were for the benefit of the parent corporation and certain of its creditors. The court went on to find that "the sale of these assets effectively prevents reorganization of the subsidiaries and destroys any possibility whatsoever of payments to the unsecured creditors of the subsidiaries." *Crutcher*, 72 B.R. at 633. In the case at bar and unlike the situation in *Crutcher*, even though the Debtor will not be reorganizing after the sale, pursuant to the Term Sheet, the unsecured creditors will be paid 65% of their claims if the sale is approved.

"The rule we (the Second Circuit) adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Lionel*, 722 F.2d at 1071. The Court finds that the Debtor presented ample evidence at the trial on the 363 Motion to support an express finding that the Debtor has shown the requisite business justification for the proposed sale. In summary, the Debtor is rapidly exhausting the available funds to keep it operating. The plant needs a significant cash infusion to stay functional and become profitable. Only nominal interest has been shown by the tire manufacturing community in reorganizing the Debtor. Rather, the only appreciable interest has been in purchasing the assets of the Debtor. Therefore, it is clear that the needed capital infusion will only be made by a purchaser of the Debtor's assets. No party other than the Purchaser has put an offer "on the table." While attached to Pensler's objection to the 363 Motion is a proposed plan in which Pensler proposes to purchase the Debtor's assets, Pensler has not filed the plan with the Court nor has it made an offer counter to the Purchaser's offer. The Committee participated in the negotiations which led to the Term Sheet, and believes that under the facts of this case that it is a fair proposal for the unsecured creditor. For these and the other reasons expressed above, the Court finds that the Debtor has proven the necessary business justifications for the proposed sale.

As stated previously, in order for the Debtor to obtain approval of its 363 Motion, the Debtor must demonstrate "a good, sound business justification for conducting the sale prior to confirmation ..., that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable." *Collier*, ¶ 363.02[4] at 363–19 to 20 (footnotes omitted). Having already found that, under the circumstances of this case, the Debtor has given adequate and reasonable notice of the sale and has demonstrated a good, sound business justification for conducting the sale, the Court must now determine if the sale has been proposed in good faith and if the purchase price is fair and reasonable.

"(W)hen a bankruptcy court authorizes a sale of assets pursuant to § 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *Cumberland Farms Dairy, Inc. v. National*

*Farmers' Organization, Inc. (In re Abbots Dairies of Pennsylvania, Inc.),* 788 F.2d 143, 149–150 (3rd Cir.1986). However, neither the Code nor the Rules defines "good faith." Courts have thus been left with traditional equitable principles to define the term "good faith." Courts have held that the phrase "good faith" encompasses one who purchases in "good faith" and for "value." *Abbotts Dairies,* 788 F.2d at 147. *See also, Prichard v. Sherwood & Roberts, Inc. (In re Kings Inn, Ltd.),* 37 B.R. 239, 243 (9th Cir. BAP 1984); *Tompkins v. Frey (In re Bel Air Associates.),* 706 F.2d 301, 302 (10th Cir. 1983); *In re Rock Industries Machinery Corp.,* 572 F.2d 1195, 1197, (7th Cir.1978).

■ In the case of *Fontainebleau Hotel Corp. v. Roland Intern Corp. (In the Matter of Bleaufontaine, Inc.),* 634 F.2d 1383 (5th Cir.1981), the Fifth Circuit approved the definition of good faith as defined by the Seventh Circuit in *Rock Industries. Bleaufontaine,* 634 F.2d at 1388 n. 7. The Seventh Circuit held:

> The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Rock Industries,* 572 F.2d at 1198 (citation omitted).

Applying this definition of good faith to the case at bar, the Court finds that there was no evidence presented at the trial which destroys the Purchaser's good faith status. The Objectors have not shown any misconduct, fraud or collusion by the Purchaser during the course of the negotiations which led to the Term Sheet. Nor have the Objectors shown any attempt by the Purchaser to take "grossly unfair advantage of other bidders." *Id.* Taylor testified that he would be receptive to offers from other parties; however, after a year of being in bankruptcy, no other offers have been made to the Debtor.

As stated previously, Pensler has expressed interest in the Debtor since 1995. Attached to Pensler's objection to the 363 Motion is a proposed plan in which Pensler states that it will purchase the assets of the Debtor. However, even though the Debtor's exclusivity period has expired,[14] Pensler has not filed its proposed plan nor has Pensler submitted a counter-offer to the Debtor to purchase its assets.

■ The Objectors cite allegations by the Committee in its motion for the appointment of a trustee as evidence of Taylor's/the Purchaser's lack of good faith. However, that is not the issue. "The integrity of the sale is the issue to be addressed—not any general past conduct of a bidder in relation to other matters." *Gross v. Russo (In re Russo),* 762 F.2d 239, 243 (2nd Cir.1985). The Court does not find, nor do the Objectors present, any evidence of misconduct, fraud or collusion by Taylor or the Purchaser which would destroy the Purchaser's good faith status.

■ The Objectors also argue that the fact that Taylor is a stockholder of the Debtor and of the Purchaser destroys the Purchaser's good faith. The Objectors cite the case of *In re Allied Gaming Management, Inc.,* 209 B.R. 201 (Bankr.W.D.La.1997). In *Allied Gaming,* the court had before it the question of whether the former accountant of the debtor-in-possession who then became the accountant and the general manager for the Chapter 11 Trustee could acquire the debtor's property through a reorganization plan. The court held that "(a)ttorneys, accountants, appraisers, and other agents or employees of bankruptcy trustees may not purchase property of the bankruptcy estate." *Allied Gaming,* 209 B.R. at 203 (citation omitted). *Allied Gaming* can be distinguished from the case at bar. This is not a situation where a disinterested party, who was appointed by the Court to perform duties regarding property of the estate, is now seeking to purchase estate assets. Unlike the situation in *Allied Gaming,* the Pur-

---

14. Section 1121(b) states that the debtor has the exclusive right to file a plan for the first 120 days after the order for relief. The Debtor sought an extension of this time, however the Court denied the motion.

chaser is not, and has never been, an employee of the Debtor.

The connection between the Purchaser and the Debtor is Titan International and Taylor. Neither Objector has cited any cases which state as a *per se* rule that a stockholder of a debtor cannot purchase the assets of the debtor. The Second Circuit has examined the question of insiders and fiduciaries as purchasers of bankruptcy estate assets and determined that there is nothing in the Code or case law which automatically disqualifies them as good faith purchasers. *See Gross v. Russo (In re Russo),* 762 F.2d 239 (2nd Cir.1985); *In re Beck Industries, Inc.,* 605 F.2d 624, 634 (2nd Cir.1979). The *Russo* court reversed lower court rulings that disqualified a past trustee of the estate from good faith purchaser status. The court also noted that the rule "prohibiting purchase of assets of a bankrupt estate by a trustee is not necessarily applicable to all who are denominated as fiduciaries." *Russo,* 762 F.2d at 242.

In *Greylock Glen Corp. v. Community Savings Bank,* 656 F.2d 1 (1st Cir.1981) the First Circuit approved a sale wherein the bank was both seller and purchaser. The First Circuit held that the bank's dual role did not affect its status as a good faith purchaser. *Id.* at 4. The same result was reached by the court in *In re Bedford Springs Hotel, Inc.,* 99 B.R. 302 (Bankr.W.D.Pa.1989). In a purchase of a debtor's assets through a plan, the court held that absent a showing of fraud, collusion or attempts at unfair advantage, an insider may be a good faith purchaser. *Id.* at 305.

The Objectors cite the case of *In re Bidermann Industries, U.S.A., Inc.,* 203 B.R. 547 (Bankr.S.D.N.Y.1997) for authority that the Purchaser is not a good faith purchaser. *Bidermann* involved the purchase of the debtor's assets by the person who was retained as the chief executive officer of the debtor-in-possession. The court held that "sales to fiduciaries in chapter 11 cases are not *per se* prohibited, 'but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse'" *Id.* at 551, *quoting, C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),*

92 B.R. 87, 93) (Bankr.S.D.N.Y.1988). However, the court went on to state that it was concerned not so much with the purchaser's position as chief executive officer, but more importantly, with the fact that he was hired by the debtor for his professional expertise in running troubled companies. "By virtue of this latter role, he was placed in a position of trust and confidence so that, if there be any consequence at all, it is that his actions ought be subjected to a scrutiny even higher than that usually accorded the debtor's management." *Id.* Examining the sale under this even more heightened scrutiny, the court found that the sale could not be approved in light of conflicts of interest, self-dealing, and inappropriate fees and bidding procedures.

In the case at bar, the Purchaser is not the chief executive officer of the Debtor. But since the Debtor and the Purchaser do share the same management, namely Taylor, the Court should subject the sale to higher scrutiny. The Court finds that since this Debtor has been in Chapter 11, Taylor has never hidden his ownership interest in the Debtor and in all of the Titan entities. Since the Debtor has been in bankruptcy, Titan has been the purchaser of 90 to 95% of the Debtor's product. After many months of fighting and discord with the Committee over *every* aspect of the case, the Debtor and Taylor reached an agreement with the Committee. Not only is the Committee composed of sophisticated creditors, but it and certain of its members are represented by experienced and knowledgeable counsel. The Committee was well aware of Taylor's position with the Purchaser and the Debtor, and the Committee believed that the final offer by the Purchaser was in the best interest of the Committee and all unsecured creditors. As previously noted, through their negotiations, the Committee was able to get Taylor, as the Purchaser, to increase his offer to the unsecured creditors from 45 cents on the dollar, with some payments over several years, to 65 cents on the dollar payable in one payment. Unlike the case where there is no creditors' committee, and therefore, the creditors are looking solely to the debtor for protection, this case has a creditors' committee which is composed of very

sophisticated creditors and that is represented by competent bankruptcy counsel. The Committee does not depend on Taylor or the Debtor to protect their rights. On the contrary, throughout this entire case, the Committee has fought the Debtor and Taylor for the benefit of the unsecured creditors. Accordingly, the Court finds that the mere fact that Taylor and the Purchaser are insiders does not disqualify the Purchaser as a good faith purchaser.

Traditionally, courts have held that value for a bankruptcy sale is defined as 75% of the appraised value of the assets. *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1197 n. 1 (7th Cir.1978); *Abbotts Dairies*, 788 F.2d at 149. However, this rule is not absolute. In *Willemain v. Kivitz (In re Willemain)*, 764 F.2d 1019, 1023 (4th Cir.1985), the Fourth Circuit upheld a bankruptcy court's decision to disregard an appraisal and approve a proposed sale upon a finding that the sale price was "not unreasonable."

In the case at bar, Mr. Dove testified that the Committee had obtained appraisals of the Debtor's property and that copies of the appraisals had been given to Pensler. However, the appraisal obtained by the Committee was never introduced into evidence by any party at the trial. Neither the Union nor Pensler submitted any evidence to support a finding that the purchase price offered by the Purchaser was unreasonable. The Term Sheet calls for a sales price sufficient to pay 100% of all secured, administrative, and priority claims and 65% of all allowed unsecured claims. Testimony at the trial was that this figure was somewhere between 30 and 40 million dollars. The consultant who was hired to get the plant producing again and profitable, Mr. Ash, testified that "the plant as it sits is not worth 30 million." (Record at 122). Mr. Ash has been in the "tire business" since 1983, and prior to that time, he did plant start ups, shut downs, and turnarounds for various manufacturing companies. As noted previously, the Court believes that Mr. Ash's statement that the Purchaser was paying too much for the Debtor was probably one of the more candid statements made during the trial.

Taking into consideration that the Debtor has been "in play" for several years, that information about its availability has appeared in trade publications throughout the bankruptcy, and that the Purchaser's offer is the only offer which has been submitted to the Debtor, the Court is "satisfied ... that the price offered is 'the best price obtainable under the circumstances of a particular case.'" *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 715 (Bankr.W.D.Tex.1989), *quoting, In re Hatfield Homes, Inc.*, 30 B.R. 353, 355 (Bankr.E.D.Pa.1983).

**D. SETTLEMENT OF CLAIMS**

The Term Sheet states that "(t)he sale will include all assets of Condere Corporation ..., including without limitation, ... causes of action (both pre-petition and post-petition)...." *Term Sheet*, page 1, April 27, 1998. The Objectors argue this sale of the causes of action is a settlement that is outside the scope of § 363 pursuant to *Braniff*.

The alleged causes of action that are proposed to be transferred to the Purchaser as a part of the overall sale of assets were raised by the Committee. The Committee filed a motion on March 26, 1998, in which it alleged that certain current and former officers and directors of the Debtor had breached their fiduciary duties to the corporation and its creditors while it was in bankruptcy. The Committee asked that the alleged causes of action be transferred to it for investigation and possible pursuit if the Committee so determined.

In *Official Committee of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative, Inc.)*, 119 F.3d 349 (5th Cir.1997), the Fifth Circuit addressed the issue of a settlement in the context of § 363(b). In *Cajun Electric*, the debtor, Cajun Electric Power Cooperative, Inc. (Cajun), a rural electric power cooperative, and Gulf States Utilities Co. (Gulf States), a privately owned electric company, entered into an agreement to build the River Bend nuclear power plant. The Rural Utilities Service (RUS) provided to Cajun loans and loan guarantees for its investment in the plant. The investment

turned into a financial disaster, and Cajun filed for protection pursuant to Chapter 11 of the Bankruptcy Code.

RUS was the largest creditor with an asserted claim of $4.2 billion, and Gulf States was the second largest creditor with an asserted claim of $400 million. There was voluminous litigation, and finally a proposed far reaching settlement was reached between the parties. The proposed settlement would, in simple terms, free the debtor from any future involvement in the River Bend nuclear power plant—the debtor would pay money for the decommissioning of the plant, dismiss suits it had against other parties involved in the power plant, and the debtor would be barred from recovering any excess funds remaining, if any, from the decommissioning of the power plant. The unsecured trade creditors, representing more than 500 trade creditors asserting approximately $7 million in claims, objected to the settlement. The unsecured trade creditors objected because they believed that the settlement gutted the estate without giving the unsecured creditors the procedural protections of the reorganization process. The district court, sitting as a bankruptcy court, approved the settlement.

On appeal, the Fifth Circuit acknowledged that *Braniff* prohibited the debtor from establishing the terms of a plan *sub rosa* in connection with a § 363 sale. "On the other hand, 'compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly.'" *Cajun Electric,* 119 F.3d at 354, *quoting, Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602 (5th Cir.1980). The Fifth Circuit found that even assuming that the committee had stated what Chapter 11 protections that they might lose if the settlement was approved, the court went on to find that the "settlement is not a *sub rosa* reorganization of the type disapproved in *Braniff.*" *Cajun Electric,* 119 F.3d at 355. In the case at bar, the Court will likewise give the Objectors the benefit of the doubt as to whether they have stated what Chapter 11 protections that they might lose if the sale of the causes of action is approved. As this Court has already found that the sale

of the Debtor's assets pursuant to the Term Sheet is not a plan *sub rosa,* the Court must now examine the sale of the causes of action to determine if the result of the sale amounts to a plan *sub rosa* which was disapproved in *Braniff.*

In *Braniff,* the Fifth Circuit found that one of the grounds for denying the § 363 motion was that the transaction "provided for the release or claims by *all parties* against Braniff, its secured creditors and its officers and directors." *Braniff,* 700 F.2d at 940 (emphasis added). The instant sale of the causes of action is not a plan *sub rosa* as was disapproved in *Braniff.* Unlike *Braniff,* this sale does not restrict any creditors' rights to vote on a plan, does not dictate any terms of any future plan, does not provide for the release of claims by any party, and it does not restrict any other party from pursuing any causes of action it may have against the Debtor. This sale "disposes of one particular 'asset,' (causes of action), which is not so much the crown jewel of (the Debtor's) estate but its white elephant." *Cajun Electric,* 119 F.3d at 355 (citation omitted).

As stated previously, the Committee filed a motion to have the causes of action transferred and assigned to the Committee. Taylor testified that he had examined the motion filed by the Committee alleging certain causes of action against former and current officers and directors of the Debtor. He stated that he found no merit in the causes of action. Taylor also stated that Condere's in-house counsel, before he left his employment shortly after the petition was filed, gave him a memo that stated that he was unaware of any breaches of any fiduciary duties by any officers or directors of Condere. The Court placed no reliance on the opinion of Taylor as to the merits of the alleged causes of action.

Mr. Dove testified that the Committee believed that causes of action existed against present and former officers and directors of the Debtor. However, unlike the creditors in *Cajun Electric,* through negotiations with the Debtor and the Purchaser, the Committee subsequently dismissed its motion and is willing to allow the causes of action to be sold to the Purchaser. In other words, the Committee opted to take hard cash instead

of retaining these tenuous causes of action. When asked if the purchase price that the Debtor is receiving for all of its assets, including these potential causes of action, was fair and reasonable, Mr. Dove stated that "the Committee, from the standpoint of unsecured creditors and its fiduciary duty to unsecured creditors, we're satisfied that, under the circumstances of this case, that it was a fair proposal; and ... the Committee agreed to accept it." (Record at 305).

The Court finds that the causes of action are not the Debtor's "crown jewels," but neither do they constitute a "white elephant" of the kind found in *Cajun Electric.* They are tenuous and the prospects of success are not clear. In order to prevail, the Committee would be required to expend a large sum of money and to spend a great amount of time. Therefore, as the Fifth Circuit found in *Cajun Electric,* the sale of the causes of action does not amount to a plan *sub rosa* as prohibited by *Braniff.*

 While the situation before the Court is not an outright settlement as the Fifth Circuit had before it in *Cajun Electric,* assuming that it is a settlement, the Court finds that the sale/settlement is fair and equitable.

In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision, "compar[ing] the terms of the compromise with the likely rewards of litigation." *Jackson Brewing Co.,* 624 F.2d at 602 (internal quotation marks and citation omitted). In particular:

[The judge] must evaluate and set forth in a comprehensible fashion:

(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

(2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(3) All other factors bearing on the wisdom of the compromise.

*Id.,* (internal citation omitted)

*Cajun Electric,* 119 F.3d at 356.

 As to the first element, the Fifth Circuit went on to state that it is "unneces-sary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. 'The judge need only apprise himself of the relevant facts and law so the he can make an informed and intelligent decision....'" *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.),* 841 F.2d 159, 163 (7th Cir.1987). *Id.* (footnote omitted). At the 363 Motion trial, no party delved into any analysis of any depth as to the facts surrounding these alleged causes of action. However, upon an examination of the motion filed by the Committee, these causes of action are for actions that the Committee alleges has harmed the Debtor and its estate. The Court finds that "the uncertainty in fact and law" of these causes of action make the probability of success very tenuous.

As to the second element, the Court finds that any litigation would cause the Debtor great expense, and would result in even further delay to the unsecured creditors receiving any money. Given the cost, the delay, and the tenuous nature of these causes of action, the sale of these causes of action is advisable.

 With regard to the third element, the Fifth Circuit stated:

Under the rubric of the third, catch-all provision, we have specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider the best interests of the creditors, "with proper deference to the reasonable views." *Foster Mortgage Corp.,* 68 F.3d at 917. Second, the court should consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 918 (internal citations omitted).

*Cajun Electric,* 119 F.3d at 356.

As the Court has already found that the negotiations which led to the Term Sheet were arms-length negotiations devoid of any fraud or collusion, the Court must only determine what is in the best interests of the creditors. Unlike the situation before the court in *Cajun Electric,* the majority of the creditors are not opposing this sale/settlement. The only parties objecting are the

union and a party who purchased a $600 claim in order to have standing to object to the 363 Motion. This Court places great weight on the agreement of the Committee, which is composed of sophisticated and knowledgeable companies, to the Term Sheet. Mr. Dove testified that after a long process of negotiations and considerable effort on behalf of the Committee and its professionals, the Committee had sufficient information to agree to the Term Sheet. He further stated that the members of the creditors' committee are in the credit business and that they are basically interested in a quick resolution of this case so that they would receive their money.

After considering the afore mentioned factors, the Court finds that the sale of the causes of action is fair and equitable. The Debtor's or the Committee's chances of recovering are uncertain; the cost of the litigation to either the Debtor or the Committee could be phenomenal; and the delay in the unsecured creditors receiving payment, if any at all, could be years. After extensive arms-length negotiations, the Committee entered into the Term Sheet with the Purchaser and the Debtor. The Court finds that for all of these reasons, the sale of the causes of action is in the best interest of the creditors of the estate.

### E. THE UNION CONTRACT

On June 10, 1997, the Debtor filed its *Motion for Order Authorizing Debtor–in–Possession to Reject Collective Bargaining Agreement with Local Union No. 303L of the United Steelworkers of America Rubber Plastic Conference and to Implement Interim Modifications Under § 1113.* As stated previously, the District Court withdrew reference as to that motion, and the Honorable E. Grady Jolly of the United States Court of Appeals for the Fifth Circuit, sitting by designation as a district court judge, heard the motion. Judge Jolly issued an order (the Rejection Order) on August 18, 1998, denying rejection of the CBA as to certain items and allowing rejection of other disputed items.

As stated previously, the parties were to submit a mutually agreed on document which would compliment the terms of Judge Jolly's order. However, it is this Court's understanding that no such document has been submitted to Judge Jolly and that the parties have more hearings scheduled before Judge Jolly on this matter.

The Term Sheet states that the sale "will include ... the assumption by Condere and assignment to ... the Purchaser of all executory contracts and unexpired leases other than those the Purchaser elects not to include in the purchase." *Term Sheet,* ¶ 2, p. 1. Prior to the trial on the 363 Motion, the Debtor and the Purchaser would not tell the Union whether the Purchaser would commit to hire current employees of the Debtor in seniority order and to accept the terms and conditions of employment provided by the Rejection Order. At the beginning of the trial, the Purchaser continued to state that it would not commit to the hiring of the Debtor's employees, that any job applicants who are hired will be treated as new employees, and that seniority as employees under the Debtor will not have any meaning. On the last day of the trial, the Debtor's counsel announced that the Purchaser would request that the Debtor assign the CBA to the Purchaser, as modified, or further modified in the future, by Judge Jolly. The Debtor further stated that a motion would be filed to assume the contract so that it could be assigned to the Purchaser.

The Court is of the opinion that any reasonable objections that the Union has to the sale of the assets can be satisfied by conditioning the sale of the assets on the assumption by the Debtor of the CBA and the assignment of it to the Purchaser, as the CBA is presently modified or further modified by the District Court.

### CONCLUSION

This Chapter 11 case presents a situation which is rarely seen in Chapter 11 cases. The Court has before it a motion which will make this a case in which all administrative claims and priority creditors are satisfied, in which the secured creditors will be paid in full (estimated to be at least 15 million dollars), and in which the unsecured creditors, many of whom are owed large sums of money, will receive 65 cents on the dollar. The

only two parties who object to the 363 Motion are the Union and Pensler.

The rights which the Union has pursuant to the CBA can be preserved by the assumption and assignment of the CBA. Any problems which the parties have with particular points in the CBA can be resolved in the District Court litigation.

As for Pensler, Pensler purchased a $600 claim of one of the Debtor's creditors on the eve of the trial on the 363 Motion in order to have standing to object to the 363 Motion. The Debtor's schedules list over 1000 unsecured creditors with total claims of $27, 612, 112. Like the creditor in *Cajun Electric*, Pensler's claim "is only a drop in the bucket." *Cajun Electric*, 119 F.3d at 358. The Committee, whose members' claims alone total over 5 million dollars, believes that the sale to the Purchaser is in the best interest of the unsecured creditors. The Court finds that their agreement to the sale to be more persuasive than a creditor holding a $600 claim.

Having considered "all salient factors pertaining to the proceeding and, accordingly, (acting) to further the diverse interest of the debtor, creditors and equity holders, alike . . .," *Lionel* at 1071, the Court finds that the sale is in the best interest of all creditors. In addition, the sale is in the best interest of the city of Natchez and the Debtor's employees—the sale of the Debtor will enable the plant to stay open in Natchez and will keep jobs for its citizens. The Court further finds that the sale is for a good value and to a good faith purchaser.

Therefore, the Court finds that the 363 Motion should be granted subject to the following modifications and conditions: ·

1. The typographical error in paragraph 4 of the Term Sheet is corrected to state that "All payments and obligations of the Purchaser will be guaranteed in writing by Titan International."

2. The name of the Purchaser in the Term Sheet is changed from Titan Corporation of Mississippi to Titan Tire of Natchez, or its designee.

3. The Term Sheet is modified as agreed to by the parties in the July 24, 1998, order with CIT Group/Equipment Financing, Inc., and the August 6, 1998, order with LaSalle Business Credit, Inc.

4. The Term Sheet is modified to state that the Purchaser shall instruct the Debtor to assume the CBA and to assign it to the Purchaser, as the CBA is presently modified or further modified by the District Court.

A separate final judgment consistent with this opinion will be entered in accordance with Rule 9021 of the Federal Rule of Bankruptcy Procedure.

### *FINAL JUDGMENT ON THE AMENDED MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 363 TO SELL ALL ASSETS OF THE DEBTOR*

Consistent with the Court's opinion dated contemporaneously herewith, and having found that the sale is for a good value and to a good faith purchaser, it is hereby ordered:

That the *Amended Motion for an Order Pursuant to 11 U.S.C. § 363 to Sell All Assets of the Debtor* should be and hereby is granted subject to the following modifications and conditions:

a. The typographical error paragraph 4 of the Term Sheet is corrected to state that "All payments and obligations of the Purchaser will be guaranteed in writing by Titan International."

b. The name of the Purchaser in the Term Sheet is changed from Titan Corporation of Mississippi to Titan Tire of Natchez, or its designee.

c. The Term Sheet is modified as agreed by the parties in the July 24, 1998, order with CIT Group/Equipment Financing, Inc., and the August 6, 1998, order with LaSalle Business Credit, Inc.; and

d. The Term Sheet is modified to state that the Purchaser shall instruct the Debtor to assume the CBA and to assign it to the Purchaser, as the CBA is presently modified or further modified by the District Court.

This judgment is a final judgment for the purposes of Federal Rule of Bankruptcy Procedure 9021.

SO ORDERED.