**In re BIDERMANN INDUSTRIES U.S.A., INC., f/a./a Blackstone, Inc., et al., Debtors.**

**Bankruptcy Nos. 95 B 43098 through 43099 (TLB) and 95 43101 through 43114 (TLB).**

United States Bankruptcy Court, S.D. New York.

Jan. 7, 1997.

Stevens & Lee, P.C. by Robert Lapowsky, Wayne, PA, Marks & Murase L.L.P. by Michael Z. Brownstein, New York City, for Debtors in Possession.

Otterbourg, Steindler, Houston & Rosen, P.C. by Scott L. Hazen, New York City, for the Official Committee of Unsecured Creditors.

Kasowitz, Benson, Torres & Friedman L.L.P. by David M. Friedman, New York City, for the Objectants.

## CORRECTED TEXT OF BENCH RULING ISSUED DECEMBER 17, 1996

TINA L. BROZMAN, Chief Judge.

Thirty years ago Judge Henry Friendly, sitting on the Second Circuit Court of Appeals, declared that the conduct of bankruptcy proceedings not only should be right but must seem right. *Knapp v. Seligson (In re Ira Haupt & Co.),* 361 F.2d 164, 168 (2d Cir.1966). In this case, the fiduciaries must have blinded themselves to Judge Friendly's counsel.

Bidermann Industries U.S.A., Inc. and certain of its subsidiaries filed chapter 11 petitions on July 17, 1995. Prior to their bankruptcy, they retained Alvarez & Marsal ("A & M") as turnaround consultants. With the inception of their bankruptcy cases, Mr. Marsal was retained as chief executive officer of the debtors in possession at a salary of $700,000 per year. Carter Evans of that firm was also retained by the debtors at a salary of $350,000 per year. In addition, the debtors were authorized to utilize the services of various A & M personnel. This whole arrangement received court approval. To date, the fee requests for the additional A & M personnel have run at about $100,000 to $200,000 for each four months.

The debtors in possession ask me to approve a letter agreement which will put into motion an anticipated leveraged buyout of the debtors by Vestar Equity Partners, L.P. ("Vestar") and A & M. Not only will A & M have a minority equity position, financed in part by a success fee which Vestar will pay to them for selling the businesses to themselves, but Bryan Marsal of that firm, who remains as the debtors' chief executive officer, will be the chief executive officer and chairman of the board of the new owner ("Newco") pursuant to an employment agreement which will be for a term of at least three years. Indeed, Mr. Marsal's retention is a condition precedent to the consummation of a chapter 11 plan which will embody the parties' agreement.

That agreement is memorialized in a memorandum of understanding to which the letter agreement is a collateral document. Although the motion as submitted requested that I approve the memorandum of understanding, that request has been withdrawn and my approval is sought at this time only for the letter agreement. However, an understanding of the proposed transaction is critical to the decision whether or not to approve the letter agreement.

Pursuant to the memorandum of understanding, Vestar, if it is satisfied with the results of its due diligence (which is well underway) and a number of other things, will invest probably $40 million and up to a maximum of $60 million based on a formula contained in the memorandum. The amount of this equity contribution is in the sole discretion of Vestar and A & M. There will also be $5 million to $6 million contributed by management and A & M as well as a $32.5 million equity contribution, or such other number as is satisfactory to Vestar and A & M, by one or more investors satisfactory to Vestar and A & M. Certain of the debtors' lenders will invest some $12 million. The balance of the stated $233 million value of the transaction will be raised by a combination of methods all relying upon the intrinsic value of the debtors' own assets, a classic leveraged buyout. The principal negotiation as to the $233 million value occurred between Vestar and one creditor, Merrill Lynch, which is one of the five institutional note holders. Merrill Lynch is not a fiduciary to the creditors. In fact, if the proposed transaction ultimately is approved as part of a plan of reorganization, Merrill Lynch will be paid fees of $3 million for underwriting the high yield debt offering of one of the debtors. As can be seen from these facts, the value of the equity contribution cannot be calculated with finality, couched as it is in the discretion of the would-be purchasers. In theory at least, the equity contribution could be minimal if the value obtained by leveraging the debtors' assets is sufficient to make most of the payments called for under the proposed plan of reorganization whose terms are dictated in the memorandum of understanding.

Just as there are provisions in the memorandum of understanding which are favorable to Bryan Marsal and his firm, there are provisions favorable to Maurice Bidermann,

the debtors' majority shareholder, whose cooperation was thereby ensured. Specifically, Mr. Bidermann will be given a 10–year option to acquire two percent of the common stock of Newco at a price equal to the price per share paid by Vestar. He will also be given an option to purchase for $5 million common stock of Newco and 13% junior preferred stock up to 15 days prior to the first date set for the confirmation hearing on the debtors' plan. Yet another option given to Mr. Bidermann will be the right to purchase up to 15 days prior to the first scheduled confirmation hearing either 20%, for $11 million, or 10%, for $5.5 million, of the common stock of the entity which will own the Arrow trademark and the rights as licensor under various Arrow licenses. He will receive a right of first refusal for a period of 180 days following the effective date of the plan in connection with any sale of stock in Cluett International, Inc., one of the emerging entities. He will receive a consulting agreement paying him $300,000 annually for five years and $750,000 on the effective date for his agreement not to compete. And not least, he will receive a release from, among other parties, the debtors. Needless to say, perhaps, these incentives have not been offered to the debtors' minority shareholders.

There are numerous conditions to confirmation of a plan, some of which are that Vestar satisfactorily completes its due diligence, that various documents are drafted to the satisfaction of, among other persons, Vestar and A & M, and that there is a resolution of certain matters with the debtors' union to the satisfaction of Vestar and A & M, among others. Consummation of a plan is conditioned on other things, including the raising of the non-equity capital. In other words, Vestar is not inescapably committed to proceed.

Notwithstanding the imprecision in the value of the equity contribution and the opportunities for Vestar to back out of the purchase, the debtors wish to be bound to Vestar in a number of respects which are laid out in the letter agreement which I am asked to approve. Specifically, in what is styled as an inducement to Vestar to undertake due diligence, the letter agreement provides:

1. for an expense reimbursement of up to $2 million;

2. for a topping fee of $2 million, or, if the consideration to the debtors in whatever form exceeds $233 million, the lesser of 10% of the consideration over $233 million or $3.8 million;

3. for a broad indemnification of Vestar;

4. that the debtors will not solicit, initiate or encourage the submission of any inquiries, proposals or offers from other potential bidders and will not furnish any such persons with any information which might lead to a competing inquiry, proposal or offer, except that the debtors shall allow the proponent of a competing offer containing a superior purchase price to conduct due diligence. Notwithstanding the bar on their encouragement of better offers, the debtors may take any of the prohibited actions if the failure to do so would violate their fiduciary duties;

5. that the debtors will not file a plan which is inconsistent with the memorandum of understanding; and, finally,

6. for the provision of an administrative expense obligation to Vestar for the previously-mentioned obligations of the debtors.

Whether Vestar needs any further inducement is open to serious doubt, since it has conducted much of the due diligence already and has locked up the cooperation of all the debtors' fiduciaries.

Two of the debtors' institutional note holders (which also hold secured claims) object to my approval of the letter agreement, pointing out that Mr. Marsal has abandoned the debtors' interests in order to advance his own personal wealth. Inexplicably, they say, when the debtors decided to sell themselves, they committed to a transaction with Mr. Marsal without retaining an investment banker or even testing the waters to see if a more favorable arrangement were available. Indeed, the objectants note that the debtors have not responded to the one solicitation which they received in September from a well-heeled investment firm, an assertion which Mr. Marsal confirmed. Instead of responding to the inquiry from that investment firm, Mr. Marsal told Vestar of the letter—and, as Vestar's managing director testified,

he informed the investment firm that Vestar was well along in its negotiations with the debtors, a patent attempt to discourage further interest. The objectants also argue that the bidding procedures and attendant fees are a disincentive to attainment of the best possible price for the debtors. The committee of unsecured creditors supports the motion, as do at least two of the five institutional note holders and the debtors' union.

*Discussion*

■ The fiduciary obligations of directors pervade bankruptcy administration. *Ross v. Kirschenbaum (In re Beck Industries, Inc.)*, 605 F.2d 624, 634 (2d Cir.1979). And the actions of the chief executive officer of the company are imbued with fiduciary obligations as well. *Id.* at 634–35. Some years ago I was faced with a dispute following a sale to the debtor's chief executive officer. Evidence had been presented that the insider had not revealed the existence or extent of certain assets which he had purchased from the debtors. *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corporation)*, 92 B.R. 87 (Bankr.S.D.N.Y.1988). As I explained there, sales to fiduciaries in chapter 11 cases are not *per se* prohibited, "but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse." *Id.* at 93. Plainly, such careful inquiry is mandated here. Not only is Mr. Marsal a fiduciary by virtue of his position as chief executive officer, but he was hired by the debtors in possession (at a salary of $700,000 per year for himself and $350,000 for one of his colleagues) for his professional expertise in running troubled companies. By virtue of this latter role, he was placed in a position of trust and confidence so that, if there be any consequence at all, it is that his actions ought be subjected to a scrutiny even higher than that usually accorded the debtor's management.

■ That Mr. Marsal has a conflict of interest almost goes without saying. On the one hand he was hired to enhance the value of the debtors' businesses; the decision being made by the debtors to offer themselves for sale, it became his obligation to help ensure that the debtors received the highest and best offer available. *Cf. Beck Industries*, 605 F.2d at 635 (court noting that the president of subsidiary to be sold was relieved from the usual obligation to obtain competing purchasers who would bid up the price to his disadvantage because his court-approved employment agreement gave him a right of first refusal). On the other hand, by virtue of his role as an equity participant, Mr. Marsal either was, or has to have been perceived as being, motivated to secure for himself and Vestar the lowest sale price reasonably attainable. Yet it was Mr. Marsal who determined the course that the debtors' reorganization was to take. He determined to break off negotiations on a "stand-alone" plan of reorganization and he decided to proceed with Vestar.

■ It is astounding that the debtors have not hired an investment banker to test the marketplace for other expressions of interest. That they had an investment banker two years ago, prior to the bankruptcy and before the businesses underwent the surgical knife and suturing of chapter 11, is really of no moment. As Mr. Marsal testified, they are a different enterprise today. How the debtors could have determined to proceed with this offer without knowing what else may be available defies any explanation other than that Mr. Marsal had made up his mind and held Mr. Bidermann in his sway with lucrative incentives. The debtors have not even bothered to offer any reason why a management-sponsored leveraged buyout is in their best interests. Mr. Marsal testified that the debtors could reorganize absent the Vestar/A & M transaction. Viewed as a whole, the proposed sale does not reveal the effective exercise of business judgment, but rather the "illicit manipulation of a board's deliberative process by self-interested corporate fiduciaries." *Official Committee v. Integrated Resources, Inc., (In re Integrated Resources, Inc.)*, 147 B.R. 650, 658 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del.1989)).

■ If the overall concept is questionable, then the bidding procedures are nothing short of incomprehensible. How could the debtors possibly agree not to encourage oth-

er offers in the face of an insider sale where a large part of A & M's equity contribution is to come from a success fee (if approved by the court) paid to the firm by one of the purchasers? Nothing could paint a more accurate picture of Mr. Marsal's conflict than that intended success fee. This sale process should have followed an intensive effort to drum up the best price obtainable for the creditors. Instead, the process aims to cut off other possible sales. There is some window-dressing making it look like the sale will be tested, for the so-called "window shop" provision allows the debtors to fulfill their fiduciary obligations by permitting due diligence to occur by others with offers exceeding the claimed value of the A & M/Vestar offer. However, the offers have to be made first, without benefit of any dialogue with the debtors or Mr. Marsal, a state of affairs which is not optimally calculated to generate the best price obtainable. This permission for due diligence by others is small solace indeed, particularly since it is Mr. Marsal who, with his professional expertise, undoubtedly will be analyzing any competing offers should the unlikely occur and an offer be made. Moreover, Mr. Marsal testified that if I were to approve the letter agreement, it is unlikely that competing offers would be received.

■ The topping fee and expense reimbursement are equally problematic. The debtors claim that the business judgment rule ought be applied to determine whether these provisions should be approved. Several years ago the use of the business judgment rule was explained in the context of bankruptcy sales in this district.

"The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' These Delaware business judgement rule principles have 'vitality by analogy' in Chapter 11.... The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: '(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.'"

*Integrated Resources,* 147 B.R. at 656 (citations omitted). The debtors are completely misguided in their argument, given that this is a management-sponsored leveraged buyout whose equity contribution is to be determined by the purchasers, including A & M, and that Mr. Bidermann, who is the majority shareholder, is receiving hefty incentives to cooperate with Mr. Marsal. There is lacking here both disinterestedness and due care, Mr. Marsal having executive positions with both the sellers and buyers and the debtors having apparently relied upon Mr. Marsal's opinion of what is right for them.

The debtors and the committee of unsecured creditors attempt to turn this dispute around to an attack on the motives of the objectants, who, they say, are simply trying to obtain more than the windfall which they will already be receiving for the claims which they acquired at a discount. There is, however, nothing inherently improper about purchasing claims at a discount. There is something to be said, in contrast, about the liquidity given to creditors through the existence of a secondary market for their claims. In any event, the motives of the objectants cannot justify what management seeks to accomplish here.

■ Three questions need to be considered by the court when it assesses proposals for breakup fees: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price? *Integrated Resources,* 147 B.R. at 657; *see also In re 995 Fifth Avenue Associates, L.P.,* 96 B.R. 24 (Bankr.S.D.N.Y. 1989).

■ I take each question in turn. There is manifest self-dealing here. The debtors are led by Bryan Marsal and Maurice Bidermann. Both of them have agreements with Vestar which will benefit them personally if Vestar succeeds. And the whole bidding ar-

rangement is designed not to encourage but to stifle bidding. Unlike in *Integrated*, where the debtors communicated with some 30 potential bidders and the chosen bidder was a "magnet" for the others, the debtors here did not negotiate with third party prospective purchasers, pick the best of them and then proceed to seek approval for topping and expense reimbursement fees. Rather, they determined to proceed with a management-led buyout where their chief executive officer and their majority shareholder may acquire equity in and salaries from the acquiring enterprise. When the "window shop" provision and the indemnification of Vestar are added to the equation, it can be seen that the aim is not to foster bidding. Significantly, discussions with the 30 potential bidders preceded the debtor's entry into the window shop clause in *Integrated Resources*. Not so here.

The debtors urge that although their management be found not to be disinterested, creditor participation through the committee of unsecured creditors saves the day. I understand how it is that the committee agreed to this proposal; it agreed because the proposal satisfied the arrangement earlier negotiated between the committee and the institutional note holders. However, once it became apparent that the debtors were amenable to a sale of the businesses, the committee should have explored whether its constituency might fare better than they would pursuant to the agreement with the note holders. The committee presented no evidence as to whether its judgment to stick by the deal with the note holders was reasonable such that, in light of the failure of the debtors to properly exercise their business judgment, the court could take comfort in the actions of and analysis by the committee. Indeed, Mr. Marsal testified that to force the note holders to go along with his offer, he and Vestar were prepared to pay the unsecured creditors in full. Yet the transaction presented does not provide this benefit to the unsecured creditors.[1] This reinforces my conclusion that the approval of the committee, negotiated before Mr. Marsal

presented his plan, did not cleanse the process such that I should approve these fees.

The third question is the size of the fees relative to the consideration to be realized by the debtors. Here, the equity investment will be a maximum of $91 million. Unless a competing bid is in excess of $253 million ($20 million more than the asserted value of the Vestar/A & M proposal), the fees to be paid will not exceed $4 million. This translates to a 4.4% payment. The maximum fees payable, regardless of price, will be $5.8 million, or 6.0%. The debtors urge that I ought to measure the fees against the value of the transaction, $233 million. I note, however, that in *Integrated*, the case on which they rely most heavily, the court excluded from the calculation of value the debtor's cash on hand. I think it appropriate to exclude from the value the monies which are to be generated from the debtors' own assets. Viewed in this light, the fees are certainly on the high side. In addition, the debtors have effectively paid already for the would-be purchasers to acquire fluency in the debtors' affairs—they have paid Mr. Marsal's hefty salary and that of his colleague while Mr. Marsal put together a proposal to buy the very companies which he was to save. In other words, the fees do not bear a reasonable relationship to the bidders' efforts. Were the magnitude of the fees the only problem with the transaction, I am confident that the problem could have been overcome. But all of the tests suggest that the fees which are requested are inappropriate.

*Integrated* compels no different result. I am largely in accord with its analysis, built as it is upon my earlier decision in *995 Fifth Avenue Associates, L.P.* What separates *Integrated* from this dispute is the facts: in the former, there was no self-dealing, a disinterested board of directors and a concerted effort to shop the debtors *before* the debtors selected a purchaser and agreed to a break-up fee and window shop provision.

The bottom line is that Messrs. Marsal and Bidermann have done little to ensure the integrity of this process because they are motivated by the possibility of personal gain.

1. Some $26 million in claims will share in some $13.5 million in differing percentages depending upon the particular debtor against which their claims are asserted.

Surprisingly, Mr. Marsal testified that strategic buyers would pay more for these companies than would a financial buyer like Vestar. Yet the debtors have chosen to proceed with the A & M/management transaction without further inquiry. Transactions like this have a heavy potential to tarnish the lustre of this practice. An insufficient record has been developed to suggest that this transaction is in the best interests of the estate. Accordingly, under the searching inquiry which is compelled by an insider sale to a professional entrusted with curing the ills of a troubled enterprise, the letter agreement must fall. Notwithstanding the delay which my decision will engender, I am obliged to ensure that the creditors are not made pawns to the professionals. In good conscience, I cannot grant this motion.

In addition, because my confidence in management and the debtors' counsel has been sorely shaken by the manner in which they sought to pursue this transaction, I am ordering the parties to show cause why an examiner with expanded powers ought not be appointed to assess the desirability of proceeding along the mapped route and to assess the fairness of any offers which may be made to the debtors for their purchase, including a Vestar offer. That motion is returnable in this courtroom on January 13, 1997 at 2:00 p.m. Any opposition is to be set forth in a writing explaining the basis there-. for which shall be filed with the court, with a copy delivered directly to my chambers, and served on the debtors, the committee, the institutional note holders and their counsel, counsel for the objectants and the United States Trustee, so as to be filed and served no later than January 7, 1997 at 5:00 p.m. IT IS SO ORDERED.[2]

2. The oral bench ruling was so ordered. This written form of my decision does not constitute an order.