**WESTSHIP, INC., Appellant,**

v.

**TRIDENT SHIPWORKS, INC., Appellee.**

**No. Civ.A. 99–2435–CIV–T–24F.**

United States District Court, M.D. Florida, Tampa Division.

April 11, 2000.

Roberta A. Colton, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, Arthur Charles Neiwirth, Neiwirth & Neiwirth, P.A., Ft. Lauderdale, FL, for Westship Inc., appellant.

Don Mason Stichter, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for Trident Shipworks Incorporated, appellee.

Howard Philip Ross, Anthony Sylvester Battaglia, Battaglia, Ross, Dicus & Wein, St. Petersburg, FL, for Trident Yacht Building Partnership, appellee.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.[1]

I. *Introduction*

Westship, Inc. ("Westship") brings this appeal from the decision of the Bankruptcy Court to allow Trident Shipworks, Inc.

---

**1.** Of the District of Massachusetts, sitting by designation.

("Trident"), the Debtor, to assume a series of leases under 11 U.S.C. § 365 (1999). Westship contends that (1) the leases are not true leases but disguised financing transactions; and (2) the Bankruptcy Court erred by evaluating the proposed assumption under the "business judgment" standard rather than applying "strict scrutiny" to the alleged insider transaction.

## II. *Background*

### A. The Players

Prior to untangling the legal issues, it is important to understand the various players involved in this dispute. Westship is a creditor in the underlying bankruptcy action. Trident is a custom yacht builder. At the time of the bankruptcy filing, Trident was constructing two vessels for Westship. Mr. Steven Nichols ("Nichols") is the sole shareholder, director, and principal of Trident. Trident Yacht Building Partnership (the "Landlord") is the lessor or sublessor of all six leases under attack by Westship. More important to Westship's argument, however, is the fact that the Landlord is a partnership (the "Partnership"), which is fifty percent owned by Rattlesnake Point Ltd. ("Rattlesnake") and fifty percent owned by the Nichols Trust (the "Trust"). The trustee of the Trust is Nichols' wife, and its beneficiaries are Nichols' children.

### B. The Leases

Prior to filing bankruptcy, Trident entered into several leases (collectively the "Leases") with the Landlord related to the operation of its business. The lease agreements came on the heels of Trident's forced move to a new location after the government appropriated its previous waterfront operations. The original lease negotiations occurred between Rattlesnake and Trident. The Partnership was formed as part of the lease negotiations.[2]

For purposes of description, the Leases are separately described below. A March 1995 letter, however, appears to incorporate all, or almost all, of Trident's obligations into one document called the Lease. The Lease, as amended, requires that the obligations under other agreements that were assumed be kept current and those obligations either became obligations under the Lease or there are cross-default provisions relating to those other agreements.

The Leases include: (1) Lease of Building G, dated March 21, 1994, as amended (the "Building Lease") with a ten-year term; (2) Sub Sublease of the Syncrolift (the "Syncrolift Sublease"); (3) the Syncrolift Construction Contract (the "Syncrolift Contract"); (4) Sub Sublease of the Accreted and Submerged Land (the "Land Sublease"); (5) Guaranty of Bonds (the "Guaranty"); and (6) Collateral Assignment of Syncrolift Lease to First Union (the "Collateral Assignment").

The Lease and accompanying contracts are inter-related. All but one of the agreements relate to lease of the real property or improvements made to the real property for Trident. The Building Lease and Land Sublease relate to the real property which comprises the business premises (the "Business Premises"). They are functionally "triple net leases" under which Trident pays the costs related to the Business Premises. The Business Premises were specifically constructed for Trident. The ten-year lease obligates Trident to pay rent, in part based on the amount of the construction loan for the improvement. The construction loan that was originally obtained was eventually superseded by a $4,000,000 bond for the construction of the premises and the Syncrolift platform.[3] The bond is secured by a letter of credit from First Union. The obligations under the bond are incorporated into the Lease.

---

**2.** Nichols testified that "I guess the sweetner with Rattlesnake Point was centered around the ability to have some sort of equity participation in it with—for my children, a trust."

**3.** The Syncrolift platform is essentially a collection of concrete platforms that are used in conjunction with the Syncrolift. The platform is a fixture.

Nichols, the principal of Trident, personally guaranteed all the obligations under both the Building Lease and the Land Lease.

The Syncrolift Sublease was executed on June 1, 1997 between the Landlord and Trident. It appears that the Landlord leased the equipment from Syncrolift and proceeded to lease the equipment to Trident. Paragraph four of the Syncrolift Sublease states that it is both a lease and a purchase of the Syncrolift System. A review of the sublease document, the arguments of counsel, and the testimony of John Kearney ("Kearney") at the bankruptcy hearing reveals that once the lease payments are complete, Trident, the sublessee, can purchase the Syncrolift System if it pays a nominal fee of one dollar and completes all the obligations under the Lease.

## C. The Bankruptcy

Trident filed a voluntary petition for bankruptcy on February 3, 1999 (the "Petition Date"). Pursuant to the Bankruptcy Code and by order of the Bankruptcy Court, Trident continued to operate its business as debtor in possession. Shortly after the Petition Date, the Landlord filed a motion with the Bankruptcy Court to set a time for Trident to assume or reject the executory contracts pursuant to 11 U.S.C. § 365(d)(3). *See* Bankr.Dkt. 6A.

On July 12, 1999, Trident moved for assumption of all the executory contracts. *See* Bankr.Dkt. 123. To support its motion, Trident argued that the assumption of the Leases was essential to its reorganization efforts. In its motion it also provided the court with a detailed accounting of the current arrears on the lease obligations. The past due amounts included real estate taxes for 1997 in the amount of $59,200 and a like amount for 1998. In addition, there was a rent arrearage in the amount of $500,000. Trident asserted that it and the Landlord had entered into an

agreement to cure the defaults on the real property leases by the immediate payment of the past due taxes, by continued payments of the pro rata monthly amounts due on the 1999 taxes, and payment of rent arrearage amortized over the six year balance of the lease. The Landlord did not oppose the motion.

Westship filed an objection to Trident's motion to assume the Leases. *See* Bankr. Dkt. 130. In its motion Westship raised several issues. Only one is at issue in this appeal.[4]

> The final and most telling reason concerning the Debtor's desire to assume the lease agreements ... whereby the Debtor acknowledges that the Debtor's principals, Steven Nichols and Margaret Nichols, individually and as Trustee, are guarantors of various lease agreements being sought to be assumed. This Motion is a back door attempt by the Debtor to relieve the principals of the Debtor from claims and liabilities that might arise by giving the Lessors first crack at all the Estate assets, thereby minimizing their personal exposure.

*Id.* ¶ 10. The "first crack" relates to the fact that if the Leases are assumed and Trident defaults or the case converts to a Chapter 7, the assumed obligations become a four million dollar administrative expense under the Bankruptcy Code. In contrast, if the Leases were rejected, the potential claim of the Landlord would be approximately $700,000. The objection *did not* explicitly argue that section 365 was inapplicable because the leases were not true leases.

## D. The Hearing

On July 26, 1999 a hearing was held by the Bankruptcy Court regarding the pending motion to assume the Leases and Westship's objection to that motion. Westship outlined its argument for the court, namely that after having reviewed

---

**4.** Westship also suggests that the assumption is a "poison pill" by Trident to make Trident's assets appear unattractive to third parties.

Apparently, Westship was, or perhaps still is, interested in buying Trident's facilities.

the extensive lease documents it was Westship's position that there were two aspects to the purported Lease: true leases, and what amounted to a loan.[5] *See* Tr. at 5. In addition, counsel for Westship argued that because the Landlord had an "insider relationship" with the Debtor, the court should forgo the usual business judgment standard and examine the transaction with stricter scrutiny. *See id.* at 6.

Trident countered that the Leases were appropriate for the commercial context and reflected an arms length transaction. Moreover, there was no "insider relationship" because the Trust was a 50/50 partner in name only. A 1995 amendment to the partnership agreement limited the Trust's voting powers and also placed them last for the distribution of assets. The court also heard testimony from Nichols and Kearney, President of Rattlesnake. At the end of the hearing the Bankruptcy Court stated its findings and ultimately approved the assumption of the leases. Westship immediately filed this appeal.

### III. *Relevant Legal Standard*

 Upon review of bankruptcy proceedings this Court will not set aside findings of fact unless such findings are clearly erroneous. *See* Fed.R.Bankr.P 8013; *Orix Credit Alliance, Inc. v. Delta Resources, Inc.,* 54 F.3d 722, 727 (11th Cir.1995). While conclusions of law are reviewed *de novo, see In re Washington,* 238 B.R. 852, 854 (M.D.Fla.1999), discretionary rulings made pursuant to the Bankruptcy Code are reviewable only for abuse of discretion. *See In re Simmons,* 200 F.3d 738, 742 (11th Cir.2000).

### IV. *Discussion*

Westship presents two arguments on appeal. The first is that the Bankruptcy Court erred by evaluating the proposed assumption under the "business judgment" test rather than applying strict scrutiny based on a purported insider transaction. Second, Westship contends that the economic realities of the Leases suggest that they are not true leases. If this were so, assumption pursuant to section 365 would be unavailable.

Trident, of course, parries that the court acted properly in allowing assumption of the Leases. Specifically, Trident argues that the court *did* apply a standard of heightened scrutiny to the transaction. As to the issue of the Leases as disguised financing arrangements, Trident first contends that this issue was never before the Bankruptcy Court and thus cannot be heard on appeal and second, even if it were before the court, nothing in evidence supports Westship's assertion.

### A. True Leases and Disguised Financing

 Before it can be determined that the Bankruptcy Court properly approved assumption of the Leases, this Court first must consider the threshold issue whether the Leases represent true leases or are simply disguised financing. Trident contends that Westship failed to "frame any issues challenging the character of the leases" to the Bankruptcy Court and, as a result, should be precluded from asserting the argument on appeal.[6] A review of the hearing transcript, however, reveals that Westship questioned the validity of the

---

**5.** Westship raised the issue of whether the lease was a "true lease" on two other occasions during the hearing. Counsel commented that "[i]t is our position that the original lease itself is questionable as to whether or not this is a true lease or actually a disguised agreement to purchase real estate." Tr. of Hearing of Debtor's Motion to Assume Lease at 17 [hereinafter Tr. at ___]. A short time later, counsel again stated "[i]t's our position this is a disguised financing agreement. It might not even be an executory contract. At a minimum we need to have a

final evidentiary hearing to determine this...." Tr. at 23.

**6.** Except for a question concerning the power of the court to order relief, an appellate court will not consider a legal issue or theory unless it was presented to the trial court. This principle is not a jurisdictional limitation but merely a rule of practice and the decision whether to consider an argument is left primarily to the discretion of the appellate court. *See Dean Witter Reynolds, Inc. v. Fernandez,* 741 F.2d 355, 360 (11th Cir.1984).

leases on at least three occasions. *See* Tr. at 5, 17, 23. Thus, the argument was before the Bankruptcy Court and implicit in the court's ruling is a finding that the leases were true leases.

At the outset it is important to clarify Westship's argument. Westship appears to offer two theories. First, Westship contends that the purported leases, or a subset of the leases, are not true leases and thus section 365 is inapplicable. If the Leases are intended as security devices, then the Landlord's claim is treated as a secured claim in an amount equal to the value of the collateral rather than as an administrative priority pursuant to section 502(b)(6). *See In re Farrell*, 79 B.R. 300, 302 (Bankr.S.D.Ohio 1987).

In addition, Westship appears to argue that even if the Leases, or a subset of the leases, are found to be true leases, Trident could not assume them pursuant to section 365(c)(2). Section 365(c)(2) prohibits the assumption of unexpired leases if the lease is really a contract to make a loan, extend other debt financing, or financial accommodations. According to Westship, the construction contracts or the responsibility for guarantees on contracts related to Syncrolift "amount to some sort of funneled financing or other accommodation." Westship Brief at 16.

Because the Bankruptcy Court did not make specific findings of fact regarding this issue, this Court's task is more difficult. The Bankruptcy Court acknowledged that the lease was far more complicated than an ordinary commercial lease. *See* Tr. at 28. At the close of the hearing the court stated "[c]oncededly, this particular lease leaves quite a bit to be desired as to clarity, and it has some features which one might justifiably object to." Tr.

at 103. Ultimately the court found, however, that "the retention of the premises [were] essential to the continuing successful economic health of the Debtor" and, as such, assumption of the lease, including the Syncrolift Sublease, was appropriate. *Id.* at 102–03. Implicit in this outcome is a finding that the Leases were true leases.

■■■■ To determine whether a lease is a true or bona fide lease some courts look to state law while other courts have turned to the Bankruptcy Code and accompanying legislative history.[7] The determination of property rights in the assets of the debtor's estate is generally a matter of state law. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). State law determines, for example, the existence and priority of a creditor's security interest. It follows that a court would look to state law to determine the existence or nonexistence of a lease. At the same time it is recognized that while a bankruptcy estate should be delimited according to state law, "the extent to which state law is to be so considered is in the last analysis a matter of federal law." *American Sur. Co. of New York v. Sampsell*, 327 U.S. 269, 272, 66 S.Ct. 571, 90 L.Ed. 663 (1946). During the drafting of the Bankruptcy Code, Congress delineated several factors it thought were important in ascertaining what is a true lease and what is a financing arrangement. *See* S.Rep. No. 95–989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849–50. At the same time, the Uniform Commercial Code as codified by Florida provides guidance to courts in distinguishing between a lease and a security interest. *See* Fla.Stat. § 671.201(37) (1999).

■■■■ An examination of the congressional record and Florida law reveals that

7. *Compare International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 750 (2d Cir.1991), *City of San Francisco Market Corp. v. Walsh*, 852 F.2d 1179, 1182 (9th Cir.1988) (stating explicitly that appropriate focus for interpretation of section 365 is federal law), *Liona Corp. v. PCH Assocs.*, 804 F.2d 193, 199 (2d Cir.1986) (examining the legislative history of section 502 for definition of lease), *and In re Lansing Clarion Ltd. Partnership*, 132 B.R. 845, 850 (Bankr.W.D.Mich. 1991) (relying on federal law), *with In re All American Mfg. Corp.*, 172 B.R. 394, 397 (Bankr.S.D.Fla.1994) (relying on state law), *In re Howell*, 161 B.R. 285, 287 (Bankr. N.D.Fla.1993) (same), *and In re Royal Food Markets, Inc.*, 121 B.R. 913, 915 (Bankr. S.D.Fla.1990) (same).

there is no significant difference between the two as applied to the facts of this case. Both Congress and Florida law instruct courts to look to "the circumstances of the case and consider the economic substance of the transaction." S.Rep. No. 95–989; *see also* Fla.Stat. § 671.201(37) (whether a transaction creates a lease calls for case-by-case analysis). In order to aid the courts in this case-specific analysis, both sources list factors that indicated the existence or nonexistence of a lease, although none was denominated as dispositive. Regardless of whether a court relies on legislative history or state law, however, the executory contract or lease must be viewed through the policies underlying the Bankruptcy Code. Specifically, executory contracts and leases that benefit the bankruptcy estate are favored while other financing arrangements that are couched in lease terms and extend a distinct advantage for the "lessor" at the expense of other creditors without benefit to the estate are to be avoided.

With this backdrop, the Court looks to the Leases at issue in this appeal. The examination is complicated by the complex, interrelated set of agreements created between Trident and the Landlord. Basically the agreements are building blocks of, or supports for, Trident's business. Because the obligations are mutually dependent, to pull one column out is to risk the collapse of the entire business. Indeed, during the hearing before this Court, Trident's counsel referred to the Leases as a "house of cards." Tr. of Mot. Hr'g, *Westship, Inc. v. Trident Shipworks, Inc.,* No. 99–2435–T–24F (M.D.Fla. Feb. 23, 2000). Concern regarding Trident's collapse appears the undergird the decision of the Bankruptcy Judge. *See* Tr. at 104.

Unfortunately, this Court's review is hampered by the lack of specific findings. While it appears that the Bankruptcy Court viewed the set of interrelated agree-

ments as one lease, it is not entirely clear from the transcript that this was so. Whether there is one lease or, at the least, two leases, does effect the analysis and, ultimately, the outcome. While the agreements related to the lease and construction of the Building Premises could properly be viewed as one lease, it is not so clear whether the Syncrolift Sublease was a part of this lease or whether it was a separate, independent agreement that was artificially tied to the Building Premises lease by a cross-default provision.

### 1. The Building Premises Lease

▮▮▮▮▮ It was not clearly erroneous for the Bankruptcy Judge to grant Trident's motion to assume the lease agreements related to the lease of real property and construction of the buildings and Syncrolift platform. When the "economic substance" of the transaction is considered, the Lease is a true lease whether it is analyzed under state or federal law.

The Lease is a typical triple net lease in which the rent stated is the "net" to the landlord because the tenant takes responsibility for taxes, operating expenses, and the like. *See Rensselaer,* 936 F.2d at 751; *James v. Commissioner of Internal Revenue,* 899 F.2d 905, 906 (10th Cir.1990). While the Lease contains many indicia of ownership, this is common in triple net leases and does not necessarily indicate the absence of a lease.

Moreover, the most significant factor in determining whether a transaction is a lease or a sale is whether the lessor has retained a residual interest at the end of the lease term. *See In re Copeland,* 238 B.R. 801, 804 (Bankr.E.D.Ark.1999). Here, it is undisputed that the land and the buildings remain the property of the Landlord upon termination of the lease. Indeed, Westship's counsel solicited this information from Kearney at the bankruptcy hearing. *See* Tr. at 73.[8] Moreover,

---

8. Ms. Colton, counsel for Westship, questioned Kearney regarding the nature of the lease:

Q: Now, is there an option to purchase under the real estate lease for the Debtor?
A: No, we do not have an option to purchase with them.

the Lease term ends before the mortgage payments are complete. *See* S.Rep. No. 95–989 (stating that if rental payments are essentially payment of the mortgage, then there is no lease). Further, there is no express provision preventing cancellation by Trident. *See* Fla.Stat. § 671.201(37)(a); *All American Mfg.*, 172 B.R. at 398. Finally, there is no option to purchase the leased property at the end of the lease term. *See* S.Rep. No. 95–989; Fla.Stat. § 671.201(37).

Consequently, the Bankruptcy Court's determination that the leases involving real property and Building G were true leases was not clearly erroneous (assuming that court employed a proper standard of inquiry). In addition, assumption of those leases under section 365 was proper, again if the Bankruptcy Court employed the proper analysis.

### 2. The Syncrolift Sublease

■ If the Syncrolift Sublease is viewed as an independent agreement, it is difficult to categorize it as a true lease. The terms of the Syncrolift Sublease stand in sharp contrast to the Building Premises Lease. Indeed, the "lease" itself states that it is both a lease and a purchase. *See* Debtor's Ex. 2, Sub-lease of Syncrolift Shiplift and Transfer System.[9] Moreover, it is undisputed that upon completion of the lease term, the Syncrolift System can be purchased for the nominal fee of one dollar. In short, the Sublease appears to be a financing agreement for the purchase of the Syncrolift System. This conclusion is supported by the argument of the Partnership's counsel at the hearing. *See* Tr. at 36.

Correct. And what Syncrolift leased to us and we sublease to the Debtor, at the

Q: So at the end of the ten years, the landlord gets the property....
A: Well, I think we already own the property, so we don't get it, we have it.
Q: Fair enough. You get the property with the building and the development all on it; correct?
A: Yes.

9. Paragraph 4 of the Sublease specifically states that the terms of the lease be "con-

end of the lease the Debtor can buy it, I believe, for $1. Whatever we can buy it for, they can buy it for. So that, they will own. They are paying for it, what she [Westship's counsel] said and is correct, but they are going to own it unless they default under the leases. So I don't think there is anything wrong with them paying for something they are going to own.

*Id.*

The analysis is complicated, however, by the fact that the Syncrolift System contains two parts—property that is easily removed without damage to other property (the "Removable Property") and the remaining components (the "Non–Removable Property"). Only the Removable Property becomes the property of Trident upon completion of the lease payments—the Non–Removable Property stays with the underlying real property.[10] Moreover, the Removable Property becomes property of Trident only if it completes the obligations under *both* the Sublease and the Building Premises Lease. Thus, arguably Trident is required to pay much more than the $1 purchase price announced at the hearing. In addition, the Syncrolift Sublease contains cross-default provisions that make the obligations under the Sublease and the Building Premises Lease interdependent. Finally, as noted by the Bankruptcy Court, the Syncrolift System is an essential part of the future success of the Debtor.

The very language of the sublease and the argument of counsel for the sublessor indicates that the purported lease is in fact a financing transaction. Due to the complex and interrelated nature of the agreements, however, it is difficult to determine

strued to include both a lease and a purchase."

10. It appears that if the Sublease terminates prematurely, the Non–Removable Property becomes property of the Landlord subject to the remaining encumbrances for which the Landlord is liable.

the exact nature of the transaction or the effect non-assumption would have on the cross-default provisions. As a result, the decision to allow assumption of the Syncrolift Sublease must be vacated and the issue is remanded for further proceedings in light of this opinion.

### B. Insider Transactions and Strict Scrutiny

This Court must now examine whether the Bankruptcy Court employed the correct standard when it scrutinized the assumption of the Leases. Before examining Westship's and Trident's dueling arguments, it is essential to establish what standard that court employed. First, the court acknowledged that ordinarily the business judgment rule governs the assumption of executory leases. *See* Tr. at 102. The court went on to state, however, that the rule is not absolute "especially not in the instance when the landlord involved has some connection with the Debtor/tenant. . . ." *Id.* at 102. As to the what standard to use in this case the court found:

> In this particular situation, the landlord is Rattlesnake Point, which is a non-insider and a totally distinct, independent, separate entity. This is a partnership, and the partnership has—in the partnership there is a 50 percent interest by a trust which is, of course connected with the Debtor in the sense the trustee is the president's wife and beneficiaries are the children. So that must temper the previously announced premise and, therefore, requires much greater scrutiny.

*Id.* Thus, it appears from the transcript that the court was cognizant of the need for higher scrutiny. Moreover, implicit in its findings is that the court determined,

even under greater scrutiny, that assumption of the Leases was appropriate.

With this backdrop, Westship's initial argument that the Bankruptcy Court failed to apply strict scrutiny to the assumption is unavailing. While the court found that Rattlesnake Point was the landlord,[11] it also determined that the Trust's involvement in the partnership required "greater scrutiny." That the outcome was not what Westship hoped is not evidence that the court failed to apply the correct standard.

It is unclear whether Westship's argument is actually one of semantics—it proposes that the assumption be examined with "stricter scrutiny" and the court states that the insider aspect requires "greater scrutiny." If so, the language "strict scrutiny" is not supported by the case law. Indeed, even the case cited by Westship, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr.S.D.N.Y. 1997), simply states that transaction involving insiders "are necessarily subjected to *heightened* scrutiny because they are rife with the possibility of abuse." *Id.* (quotation omitted, emphasis supplied). Moreover, *Bidermann* involved the sale of the debtor's assets to a fiduciary pursuant to section 363, not the assumption of the unexpired leases under section 365. Thus, it is not even clear that the law requires heightened scrutiny, although it was prudent of the Bankruptcy Court to look closely at the assumption.

The next logical step in the argument is to allege that the court applied the standard incorrectly. Although in its brief Westship failed to do so and instead rested on the contention that the correct standard was not applied at all, at oral argument Westship's counsel did assert that the Bankruptcy Court erred in applying the

---

**11.** The court appeared to base this finding on the fact that Rattlesnake owned the land. Rattlesnake put the land in the partnership and the trust gave back a note for its share of the land. The note was to be paid upon sale of the land. *See* Tr. at 33. Moreover, the Trust had no management power and essentially a less than 50% economic interest in the partnership. *See id.* In addition, it appears from the testimony that the lease was negotiated with Rattlesnake—not the partnership. Based on these facts, it was not clearly erroneous for the Bankruptcy Court to find that Rattlesnake was the actual landlord.

standard. In any event, this Court concludes that the Bankruptcy Court did not err.

■ Courts generally adhere to the business judgment rule in approving a request for the assumption or rejection of an unexpired lease. Under this rule, the assumption of an unexpired lease is appropriate if the debtor in possession can demonstrate that it will benefit the estate. Once it is demonstrated that assumption will benefit the estate, it is unnecessary to inquire whether another alternative will yield a greater gain.

■ While a transaction involving insiders is not prohibited, it is subjected to heightened scrutiny. *See In re Condere Corp.*, 228 B.R. 615, 631 (Bankr.S.D.Miss. 1998); *Bidermann*, 203 B.R. at 550. The cases employing this heightened scrutiny, however, involved the purchase of debtor assets by fiduciaries pursuant to section 363, not the assumption or rejection of leases under section 365. *See In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239(MBM), 97 Civ. 2241(MBM), 1997 WL 283412 (S.D.N.Y. May 29, 1997) (unpublished opinion); *Condere Corp.*, 228 B.R. at 631; *Bidermann*, 203 B.R. at 551. In these cases the courts required the parties to have acted in "good faith." They examined the conduct of the parties to determine if there was "fraud, collusion ... or an attempt to take grossly unfair advantage of other bidders." *Angelika Films*, 1997 WL 283412, at *7. For all intents and purposes, if misconduct were present, the transaction was not a sound business decision and the parties failed to meet even the low threshold of the business judgment rule.

■ There is ample evidence in the record that the assumption of the Leases was in the best interest of the estate. The leased property was uniquely suited for Trident's business and there was no viable economic alternative to establish the business in a different location. Indeed, substantial money had already been spent to build the facilities to Trident's needs. In addition, Trident and the Landlord had arrived at an agreement to cure the default in the lease that was advantageous to the estate. The compromise provided for an extension of the cure period, the discount of the cure claim by $100,000, and the reduction of the interest rate accruing on the arrearage. Thus, at a minimum, Trident met the light burden imposed by the business judgment rule.

Moreover, there was no evidence of fraud, collusion or bad faith on the part of Trident or the Landlord. There was evidence that prior to entering the Leases, Trident had looked at other locations and found comparable costs. *See* Tr. at 96. Further, the testimony of both Kearney and Nichols indicated that the Leases represented a bargained-for exchange. *See* Tr. at 63, 88–89. Both the court and counsel for Westship questioned the witnesses and uncovered no covert plan to drain the estate. While the assumption of the leases created a significant burden on the estate should Trident default, rejecting the Leases would have resulted in the dissolution of the business—a result directly contrary to reorganization.

## V. *Conclusion*

Based on the foregoing, the decision of the Bankruptcy Court to allow assumption of the Leases, except for the Syncrolift Sublease, is AFFIRMED. [Docket No. 15]. The determination that the Syncrolift Sublease was a true lease, however, is VACATED and this matter is REMANDED to the Bankruptcy Court for further proceedings in light of this decision.