## In re MORANDE ENTERPRISES, INC., Debtor.

Morande Enterprises, Inc., Debtor in Possession, Plaintiff,

v.

FRVG, LLC, Defendant.

Bankruptcy No. 9:05–bk–00699–ALP. Adversary No. 05–87.

United States Bankruptcy Court, M.D. Florida, Fort Myers Division.

June 21, 2006.

Stephen R. Leslie, Stichter, Riedel, Blain & Prosser, Tampa, FL, Robert F. Reynolds, Lisa M. Schiller, Rice Pugatch Robinson Schiller, PA, Fort Lauderdale, FL, for Debtor.

*ORDER ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON COMPLAINT FOR DECLARATORY RELIEF CONCERNING OWNERSHIP OF AND LIENS AGAINST PROPERTY* (Doc No. 4)

ALEXANDER L. PASKAY,
Bankruptcy Judge.

THE MATTER under consideration in this yet to be confirmed Chapter 11 case of Morande Enterprises, Inc., (the Debtor) is Debtor's Motion for Summary Judgment filed in the above-captioned Adversary Proceeding. In its Complaint, the Debtor asserts that certain transactions between the Debtor and FRVG, LLC (FRVG) are, in fact, not true leases but financing ar-

rangements. Therefore, the Debtor is, in fact, the true owner of the property and has a right to treat FRVG merely as a creditor who might have, if perfected, a secured claim, if not, an unsecured claim to be dealt with within the context of a Plan of Reorganization. Based on the foregoing, it is the contention of the Debtor that it is not required to assume these leases and comply with the requirements of Section 365(b) for assumption of unexpired leases.

In its Motion for Summary Judgment, the Debtor contends that there are no material issues of fact and, based on same, it is entitled to a declaration by this Court to resolve the issue in its favor as a matter of law.

The following facts are indeed without dispute and can be summarized as follows. At the time relevant, the Debtor was and still is engaged in the business of selling new and used automobiles, providing repair services for automobiles and also selling replacement automobile parts. The Debtors principal place of business is located in Collier County, Florida.

On January 18, 2002, the Debtor and FRVG entered into an Agreement which was entitled Lease/Agreements to Purchase. (The First Agreement). The document identified FRVG as the landlord and Morande Enterprises, Inc., as the tenant. This Lease was designed to cover all certain real property known as 8300 Radio Road, Naples, Florida, and legally described on Debtor's Exhibit A, which is attached to this Agreement. (Debtor's Exhibit A). The First Agreement provided for the payment of rent for each year during the term of the Lease of $350,000.00 (minimum annual rent) payable in equal monthly installments of $29,166.67 in advance. The rent as stipulated in Section 5 of the First Agreement provides for the escalation of the minimum

annual rent based on inflation adjustment and a percentage change in the Consumer Price Index (CPI). The Lease is a triple-net Lease, that is, it is the responsibility of the tenant for the payment of taxes, insurance, maintenance, utilities and all other charges. Section 20 of the First Agreement requires that the tenant shall be responsible for all maintenance, repairs, and replacements of the premises and it is the obligation of the tenant that all fixtures pertaining to heating, air conditioning, water and sewer and sprinkler system, if any, shall be kept in good order and repair.

One of the covenants which is the basis for the dispute between the parties is set forth in Section 33 of the Lease entitled "Agreement to Purchase." This covenant grants to the Debtor an exclusive option to purchase the premises, as is, by payment of $30,000.00 on the commencement date for the option (initial option payment) and to pay $30,000.00 at the commencement of each Lease year during which the Lease is in effect. The covenant further provides that the initial option payment and additional option payments shall be applied toward the purchase price payable by the tenant to the landlord at the closing for the sale and purchase of the premises. Lastly, it also provides that if the tenant fails to close on the premises on the fifth anniversary of the commencement date, all option payments shall be forfeited and become the sole "possession" (sic) of the landlord. Section 34(a) of the First Agreement fixed the purchase price for the premises as $3,750,000.00. It further provides that in the event the tenant closes and purchases the premises in the third or the fourth lease year, the purchase price for the premises shall be $3,850,000.00. If the tenant closes on the premises in the fifth lease year the purchase price shall be $4,000,000.00.

The covenant which is the genesis of the major point of contention between the parties is based on Section 36 of the First Agreement. This covenant provides that if by the expiration of the date of this Lease, the tenant has not exercised the option, the tenant shall be required to purchase the premises for $4 million, therefore, the Debtor contends the covenant in Section 36 entitled "Mandatory Exercise of Option" is mandatory and cannot be avoided. Thus, in the event that the tenant fails to do so, the landlord shall be entitled to bring an action for specific performance to enforce the purchase of the premises by the tenant.

The covenant in Section 37 requires the landlord to timely make all mortgage payments to the Fifth Third Bank. Section 16 of the First Agreement also provides that upon the expiration or sooner termination of the Term of this Lease, the tenant shall quit and surrender to the landlord the premises in good order and condition, ordinary wear and tear and damage by insured casualty excepted. Section 18 of the First Agreement provides that all permanent installations, alterations, additions, improvements upon the premises made by or on account of the tenant except for trade fixtures shall become the property of the landlord when installed. Section 28 of the First Agreement provides for the landlord's remedies upon the tenant's default and among the several, upon a default the landlord has the option to treat the Lease as terminated and resume possession of the premises, or may retake possession of the premises for the account of the tenant holding the tenant liable for damages, including the difference between the rentals and other charges stipulated to be paid and the net amount which the landlord recovers from reletting and selling the premises.

On February 22, 2002, the Debtor and FRVG executed an Amendment to the First Agreement agreeing that the Amendment to the Lease was to "correctly identify the Mortgagee as Independent Bankers' Bank of Florida". *Id.* On the same date, FRVG executed a Memorandum of Option in favor of the Debtor, thus, giving the Debtor the option to purchase the above-stated 10.04 acre parcel of real property located in Collier County. *Id.*

On November 24, 2003, the Debtor and FRVG entered into a second Agreement entitled Lease/Agreement to Purchase (the Second Agreement) and covers an undeveloped 8.39 acre parcel of real property located adjacent to the 10.04 acre parcel covered by the First Agreement in Naples, Florida. (Debtor's Exhibit B) In essential terms, the Second Agreement is identical to the First Agreement, especially Section 35 which provides for the method of exercising the option/other option terms. Subclause (a) fixes the purchase price at $2,750,000.00 in the event the tenant closes in the fourth lease year the purchase price shall be $2,850,000.00. And in the event the tenant closes on the fifth lease year the purchase price shall be $2,950,000.00. The Second Agreement, just like the First Agreement, provides in Section 37 entitled "Mandatory Exercise of Option," that if by the expiration date the tenant has not exercised the option, tenant shall be required to purchase the premises for $3,058,278.00. Therefore, if the tenant fails to do so the landlord shall be entitled to bring an action for specific performance.

The Second Agreement also provides, *inter alia*, in Section 16 for the return of the premises upon the expiration or sooner termination of the Term of the Lease. Section 17(a) of the Second Agreement provides that a tenant shall not commence any construction or make any changes or alterations of any nature without the landlord's written consent. The tenant specifically acknowledged that any review or approval by the landlord of any plans or specifications is solely for the landlord's benefit and is without any representation or warranty to the tenant with respect to the adequacy, correctness or efficiency of the specifications. The Second Agreement also contains the provision which deals with the ownership of the improvements and also makes the same provisions as set forth earlier in conjunction with the discussion of the First Agreement. Equally, the Second Agreement has a detailed provision setting forth the landlord's remedies upon default of the tenant, which includes the landlord's right to resume possession of the premises and consider the Lease to be terminated or retake possession of the premises for the account of the tenant.

On March 24, 2006, FRVG filed an Amended Answer to the Complaint and asserted as an affirmative defense, equitable estoppel or, in the alternative, the Debtor waived its right to challenge the character of the transaction or is barred by the doctrine of *res judicata* to do so.

These are the undisputed facts based on which the Debtor contends that it is entitled to a declaration by this Court that both Agreements are not true leases but, in fact, are disguised financing agreements.

The benefit to a debtor in transforming a Lease into a financing arrangement is not a new concept and certainly provides ample motivation for a Chapter 11 debtor to pursue the recharacterization of such a transaction. This is so because if the debtor is successful in recharacterizing the transaction, the debtor is able to retain possession of the leased property during the pendency of the case without having to comply with the ongoing postpetition rent payment requirements of Section 365(b)(3) of the Code. In addition, in the case of real

estate leases, the debtor does not have to assume the Lease pursuant to Section 365 of the Code and comply with the conditions precedent for assumption set forth in Section 365(b) of the Code, notably the requirement to promptly cure all defaults, compensate for damages and to assure future performance. The most significant advantage the debtor may gain if it is successful in obtaining the recharacterization of the transaction from a true lease to a financing arrangement is that in the event the lessor has a perfected a security interest, the debtor will be able to bifurcate the claim under Section 506(a)(1) and limit the allowance of the secured claim to the current value of the property involved and treat the balance as a general unsecured claim, which would be readily subject to an adjustment under the reorganization Plan. The most drastic result which might be achieved by the debtor in the event the lessor fails to perfect its interest in the subject property by including a grant of an equitable mortgage or by recording a memorandum in the public records of its interest in the subject property, is that the landlord's claim will be nothing more than a general unsecured creditor and will be treated as such which, in most instances, will give the landlord a substantially lesser return on its claim than the amount owed.

Whether an agreement which facially appears to be a true lease should be recharacterized as a financing agreement for commercial or bankruptcy law purposes has been recently considered by several courts, especially involving airport facilities leases by airlines.

The major litigations to attempt to resolve this question arose in the cases of United Airlines which challenged the leases at the airports in New York (JFK); *Bank of New York v. United Air Lines, Inc.*, 2005 WL 670528 (N.D.Ill.2005); San Francisco (SFO) *HSBC Bank USA v. United Air Lines, Inc.*, 317 B.R. 335 (N.D.Ill.2004); Los Angeles (LAX), *U.S.Bank v. United Air Lines, Inc.*, 331 B.R. 765 (N.D.Ill.2005) and Denver, *United Air Lines, Inc. v. HSBC Bank USA*, 322 B.R. 347 (N.D.Ill.2005). In the *United* cases the Bankruptcy Court ruled that the JFK, SFO and LAX leases were in reality disguised financing arrangements and, therefore, not subject to Section 365. However, the court also held that the Denver lease was a true lease, not subject to recharacterization. In resolving the issues, the Bankruptcy Court relied on the "economic realities test," citing *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193 (2d Cir.1986); *City of San Francisco Mkt. Corp. v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d 1179 (9th Cir.1988) and *City of Olathe v. KAR Dev. Assocs. L.P. (In re KAR Dev. Assocs. L.P.)*, 180 B.R. 629 (D.Kan.1995). Under this analysis, the court looked to the substance of each lease structure without regard to the form adopted by the parties. The court primarily relied on the case of *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.)*, 155 B.R. 824, 838 (Bankr.N.D.N.Y. 1993) in which the Bankruptcy Court set forth the factors which it considered to be appropriate in determining whether a lease is a true lease or is, in fact, a disguised financing arrangement.

On appeal, the District Court rejected the Bankruptcy Court's approach and its conclusions. The District Court held that whether or not a transaction is a true lease or a disguised financing arrangement should be determined with reference to the applicable state law. In choosing the state law as the governing principle and rejecting the adoption of the federal common law standard, the District Court relied on the decision of the Supreme Court in *Butner v. United States*, 440 U.S. 48, 54, 99

S.Ct. 914, 59 L.Ed.2d 136 (1979). On further appeal the Seventh Circuit agreed with the District Court that the appropriate standard by which the courts must evaluate the true character of a lease shall be made with reference to the applicable state law. The Seventh Circuit did not rule out the possibility that state law could be found in conflict with the Code, therefore, there is still room to argue for the adoption of the federal common law doctrine using a "functional approach" to leases. *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609 (7th Cir.2005). The Seventh Circuit in its decision focused on five aspects of a transaction in the case of SFO, and concluded that as a matter of state law that the lease-leaseback arrangement was, in fact, a secured loan which was not subject to Section 365 of the Code.

The Seventh Circuit pointed out that the so-called rental payments under the leaseback to United were tied to the amount borrowed from the bondholders and not to the market value of the maintenance base covered by the Lease. Second, the rent was structured to make interest only payments on the bonds for 36 years with a $155 million balloon payment at the end of the lease. Finally, the court focused on the absence of any meaningful residual interest of the Airport Authority at the conclusion of the leaseback agreement. The transaction basically was the same concerning LAX. The Ninth Circuit arrived at the same conclusion. *United Air Lines Inc., v. U.S. Bank*, 2006 U.S.App. Lexis 11074 (7th Cir. May 4, 2006).

It should be apparent from the foregoing the leases involved in the United Airline cases were clearly financing transactions since the entire transaction was directly tied to the servicing of the bond issue, the proceeds of which were used to construct and maintain the facilities involved. It was not difficult to conclude from the foregoing that, considering the nature of the subject matter of the so-called lease and the method of payment, it did not have the hallmark of a true lease and it was appropriate to recharacterize the leases as financing transactions.

In the present instance, the Debtor in its post-hearing submission contended that in both the First and the Second Agreements the covenants in Sections 36 and 37, respectively, entitled "Mandatory Exercise of Option" compels the conclusion that both the First and Second Agreements are not true Leases but are, in fact, disguised financing transactions. According to the Debtor because of the mandatory purchase requirement in both Agreements, FRVG does not retain any meaningful economic reversionary interest in the subject properties. According to the Debtor, because the monthly rent and the option payment payable under the Agreements are noncancelable and the Debtor must purchase the property not later than the end of the term, the Debtor is in fact the true owner of the property and not a putative tenant under the Lease, citing *American President Lines, Ltd v. Lykes Bros. Steamship Co. Inc. (In re Lykes Bros. Steamship Co., Inc.,)*, 196 B.R. 574, 580–581 (Bankr. M.D.Fla.1996). In this case the court held that the distinction between a true lease and a financing transaction is based on the economic substance of the transaction, and not on the form of the transaction or the labels used by the parties to identify the transaction. The Debtor further cites the case of *Westship Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 863 (M.D.Fla. 2000), which also stands for the proposition that in determining the use of the subject property the court should consider the economic realities test to determine whether agreements involving real property are true leases or disguised financing arrangements. The Debtor also cites several

cases that purport to represent the law of the State of Florida which involved eminent domain proceedings in which there is some language to the effect that the lessee under the written lease is the owner of the property in the Constitutional sense and is entitled to share in the compensation when all or part of the lease property is taken during the period of the lease.

In the present instance, the two Agreements under consideration lead the reader to the conclusion that the documents represent nothing but ordinary commercial leases. Throughout both Agreements the covenants have the characteristics of a true Lease. The Agreements specify the fixed term and also provide for the precise monthly payments. In addition, both Agreements provide for the return of the premises to the landlord, a determination of the ownership of the improvements, and the landlord's remedies upon default, all of which bespeaks against the notion that by virtue of the execution of these Agreements, the Debtor became the owner of the Leased premises. The difficulty, however, is that the option feature in these Agreements especially Covenant No. 36 in the First Agreement and Covenant No. 35 in the Second Agreement provide that if by the expiration of the date of the Leases the tenant has not exercised the option, the tenant shall be required to purchase the premises for $4 million under the First Agreement and for $2,950,000.00 in the Second Agreement. It is clear from these covenants and the Debtor is correct in its position that at the end of the term of the Leases, the landlord has no reversionary interest. Thus, under the functional test or the economic reality test, the conclusion would be inevitable that this was, in fact, a financing arrangement and not a true Lease.

This Court is not persuaded by the proposition urged by counsel for the Debt-or that the authorities compel the conclusion that the execution of a Lease was actually a conveyance of the ownership of the leased property and the Debtor became the legal owner of the property involved. If this is true it would produce an unacceptable absurd result that someone could acquire a piece of land without paying for the same, except the pre-fixed purchase price in each of the Agreements which must be paid by the Debtor at the end of the term. The relevant provisions in these leases are not like some chattel leases where the lessee is permitted to purchase the leased chattel at the end of the term for a nominal price, such as $10. It is equally extremely difficult to conceptually accept the proposition that the landlord is, in fact, the lender and the tenant is the borrower when it is clear that the landlord never lent any funds to the debtor and had absolutely no monetary obligations under the Lease to lend any funds to the Debtor. On the contrary, all monetary obligations under the Lease were placed on the Debtor even separate and apart from the provisions for option payments. Thus, under this scenario it is extremely difficult to characterize the transaction as a financing arrangement.

In addition, assuming for the purpose of discussion if this Court accepts the proposition urged by the Debtor that would lead to the vexing questions: What is the legal status and what is the position of FRVG? Under this scenario, if the Debtor is the owner of the property for which the Debtor paid nothing, it has no obligation to pay any past rent currently due or any rent which might accrue in the future. On the other hand, if the transaction is deemed to be a financing arrangement under which the FRVG is deemed to be the lender and the Debtor is the borrower, the legal status of FRVG would be the status of an unsecured creditor unless somehow it did perfect its security interest in the subject

property. This record is devoid of any evidence that FRVG ever recorded any instruments which would perfect any cognizable interest in the subject property. Under this scenario FRVG would simply be an unsecured creditor who is only entitled to treatment on par with the other general unsecured creditors. This conclusion could lead to the ultimate absurd reach of the Debtor's contention that the Debtor would be entitled to recover all postpetition rent payments made by the Debtor under Section 549. This conclusion would completely defy common sense and clearly cannot be the correct resolution of this dispute.

Having considered the totality of the evidence and the relevant terms of the two Agreements and the impact and the meaning of the Covenants in both Agreements of the mandatory exercise of the option, this Court is constrained to reject the proposition that the transactions were financing arrangements, not true leases. This record does not support the proposition that granting a leasehold in real property conveys legal ownership to the tenant and, in fact, the tenant is the owner of the property if the Lease provides that the landlord has no reversionary interest in the subject property.

The burden to establish the contention urged by the Debtor is clearly on the Debtor. This Court is satisfied that the proof presented is not even in equilibrium and, therefore, the Debtor has failed to carry its burden and establish with the requisite degree of proof that the two Agreements under consideration are not true Leases but financing arrangements. Thus, the Motion for Summary Judgment should be denied.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Debtor's Motion for Summary Judgment (Doc. No. 4) be, and the same is hereby, denied. It is further

ORDERED, ADJUDGED AND DECREED that a pretrial conference shall be scheduled before the undersigned in Courtroom D, United States Courthouse, 2110 First Street N., Ft. Myers, Florida, at 10:30 a.m. on August 10 2006, to establish the proper procedure to conclude this Adversary Proceeding.

DONE AND ORDERED.